515 A.2d 1027

Darrell Musser, Steve Brachbill, District 1199P National Union of Hospital and Health Care Employees AFL-CIO, Appellants *v.* County of Centre, Centre County Prison Board, Appellees.

Argued May 16, 1986, before Judges Barry and Palladino, and Senior Judge Rogers, sitting as a panel of three.

*Joseph M. Devecka,* for appellants.

*John W. Blasko, McQuaide, Blasko, Schwartz, Fleming & Faulkner, Inc.,* for appellees.

Opinion by Judge Palladino, October 3, 1986:

Darrell Musser and Stephen Brachbill (Guards) and District 1199P National Union of Health Care Em-

ployees, AFL-CIO, (Union) appeal from an order of the Court of Common Pleas of Centre County (trial court) correcting an award of arbitration by reversing the arbitrator and reinstating the Guards' discharge from their employment at the Centre County Prison. We affirm.

The Guards were employed as correction officers at the Centre County Prison. On August 30, 1984, notice of termination was given to the Guards. The Centre County Prison Board, (Prison Board) in whom authority for management of the prison is vested, ratified Warden Jeffrey Bell's discharge of the Guards. These discharges resulted from the physical abuse and shackling of inmate Robert Riggleman[1] in contravention of state

---

[1] In the Arbitration Award dated February 27, 1985, Arbitrator Raymond L. Hogler made the following findings:

Riggleman (the inmate against whom the alleged acts were committed) provided the following uncontroverted version of events.

Riggleman said that he had been sentenced in August 1983 to prison for commission of a crime. He was scheduled to be released in August 1984, and at that time, he was serving as a trustee. The duties of a trustee included serving meals and performing general clean-up. Trustees, Riggleman testified, were given reduced sentences in exchange for work performed.

Riggleman stated that he had previously served a term at the facility and had become acquainted then with Bell, Brachbill, Musser, and other personnel. Both of the Grievants had been corrections officers during Riggleman's previous incarceration. They were normally responsible for overseeing Riggleman's activities during their tour of duty. On August 14, Riggleman was scheduled for release from confinement. The events giving rise to the discipline in this case took place between the hours of 5 p.m. and 11 p.m. on the days of August 10, 11, 12 and 13.

At approximately 10:00 p.m. on the evening of August 10, Riggleman was in his bunk in the trustees' dormitory. Musser came downstairs and informed Riggleman that an

regulations.[2] On September 4, 1984, a written grievance was filed by the Union as provided by Article XXII of the Collective Bargaining Agreement (Agreement) between the County of Centre and the Union. After a

inmate had 'flipped out' in the main cell block. Musser told Riggleman to come upstairs and clean up the mess. Riggleman dressed and went up the stairs and through the kitchen.

Accompanied by Musser and a trustee named David Nicholas, Riggleman proceeded into the hallway. He then observed Brachbill 'peeking around the corner' of a large linen closet where clothing was stored.

Nicholas, Brachbill and Musser seized Riggleman and wrestled him to his knees. They next thrust a pillowcase filled with shaving creme over his head and rubbed it over his head and face. The shaving creme got into Riggleman's mouth and nose, making it difficult for him to breathe.

After a few moments, one of the men removed the pillowcase and someone took Riggleman's picture. Riggleman rinsed his head off in the sink. Musser then put a handful of creme on Riggleman's head and rubbed it into his hair. Riggleman was 'cursing and yelling' at the three men.

The episode concluded before the 11:00 p.m. lockup. To Riggleman's knowledge, no inmate had 'flipped out' and created a mess.

Riggleman said that there was no point in reporting the incident, since the complaint was initially given to the corrections officer. He added that the Lieutenant in charge of the shift was watching television during the event.

On August 11, Riggleman ate the evening meal and cleaned up the dishes. He went into the main office and asked permission from Lt. Bodge to go downstairs to the dormitory. Bodge replied that Riggleman should ask the corrections officers. The officers on duty were Brachbill, Musser and Goodrow. Riggleman made his request to Brachbill and Musser, who told him that he had to remain upstairs.

Some time later, Riggleman was walking into the main hallway when Nicholas, Musser and Brachbill again seized him. While Brachbill and Nicholas held Riggleman, Musser went to the medical supply room and returned with Ben-Gay ointment. Brachbill and Nicholas pulled

conference required by the grievance procedure result-
ed in a decision to affirm the dismissals, the Union noti-
fied the Prison Board of its intent to arbitrate the dis-
missal under the Agreement. The parties stipulated

down Riggleman's pants. Musser put an amount of Ben-
Gay on his hand, then rubbed it onto Riggleman's penis
and testicles. Riggleman was released, at which point he
went to a nearby shower and stepped, fully clothed, under
the cold water.

Riggleman next proceeded to the linen closet, where he
obtained dry clothing. As he was coming out of the linen
room, he was confronted by Goodrow, Brachbill and
Nicholas. The three handcuffed Riggleman to Gate No. 2
and also put shackles around his ankles. Riggleman testi-
fied that the handcuffs were improperly locked and were
tightening on his wrists. His hands were wrapped around
one of the bars on the gate.

One of the group produced a paper bag and wrote a word
on the bag. The word, according to Riggleman, meant
'suck cock'. The three put the bag over Riggleman's head
and took a photograph. Riggleman said that he struggled
to keep the bag off his head but was unable to do so.

The group shortly thereafter removed the handcuffs from
the gate, but Riggleman remained handcuffed and shack-
led. At that point, Lt. Bodge entered the hallway. Bodge
told the corrections officers to remove the handcuffs and
shackles, which they did.

Riggleman walked through the kitchen into an area adja-
cent to the main entrance, which was referred to as the
'lawyer's room'. The lawyer's room contained several small
desks normally used for conducting interviews.

As Riggleman approached the room, Nicholas and
Goodrow grabbed him and threw him to the floor. Brach-
bill arrived with handcuffs and shackles, and Riggleman
was shackled to a pair of desks, with one leg to each desk.
His hands were cuffed, and by means of a restraining belt,
secured to a candy machine.

One of the off-duty corrections officers came into the room
with the officer's nephew. The officer pointed to Riggleman
lying on the floor and said to his nephew, 'See what you
get when you're a bad boy?'.

that the dispute was procedurally and substantively arbitrable and that the labor agreement was the governing document in the matter.

Musser subsequently came out of the cell block and sat on Riggleman's stomach. Musser threatened 'to whip out his dick' and rub it on Riggleman, but did not actually do so. Next, Musser and Goodrow used a large felt-tipped pen to Mark Riggleman's body. They drew circles around his nipples, marked his face, put stripes on his penis, and wrote the names of two known homosexuals on Riggleman's buttocks.

Following that event, Riggleman was released from the desks, and handcuffed and shackled once again. Musser and Goodrow commenced the evening check on the inmates, with Riggleman accompanying them. The inmates laughed at Riggleman's appearance.

Shortly thereafter, Riggleman was freed and permitted to go downstairs to the dormitory. Other corrections officers observed his condition, and Lt. Bodge took several photographs, which he later showed to Riggleman.

On August 12, Brachbill, Musser and Goodrow were on duty, and Nicholas was present in the area. Around 7:00 p.m., Brachbill and Nicholas wrestled Riggleman to the floor and held him down. Musser went into the medical room and returned carrying a clear plastic bottle with a 2-inch spout. The bottle was filled with water.

While Brachbill and Nicholas restrained Riggleman, Musser attempted to insert the spout in Riggleman's anus. Despite Riggleman's struggles, Musser succeeded in inserting the tube and emptying the bottle into Riggleman's body. Brachbill, Musser and Nicholas then ran out the gate.

The final series of events took place during the evening of August 13. Musser approached Riggleman and gave him a choice between having his head shaved or his testicles shaved. Musser and Brachbill escorted Riggleman through the kitchen, downstairs into the dormitory area, and seated him in a barber's chair. Brachbill, using a mustache trimmer, and Musser, with scissors, cut off Riggleman's hair.

[2] The Pennsylvania Code provides, in pertinent part, the following:

The arbitration hearing was held on January 22, 1985. On February 27, 1985, the arbitrator rendered an award in which he reversed the decision of the Prison Board to discharge the Guards. The arbitrator concluded that there was not cause for discharge. However, he also concluded that the Guards' conduct was deserving of some punishment. He then imposed a four-week sus-

---

(5) *Use of physical force.* The following shall govern the use of physical force:

(i) Physical force shall not be used on prisoners unless necessary, and then only that amount of physical force which is required to achieve the purpose is justified.

(ii) The use of necessary physical force shall be restricted to the following situations:

(A) If absolutely necessary in self-defense or to prevent an assault on staff or other prisoners.

(B) To prevent escapes.

(C) To prevent serious destruction of property.

37 Pa. Code §95.241(a)(5).

. . . .

(7) *Instruments of restraint.* The following shall govern the use of instruments of restraint:

(i) Instruments of restraint, such as handcuffs, chains, irons, come-a-longs, and straitjackets, shall not be used as a punishment.

(ii) Instruments of restraint may be used in the following circumstances:

(A) As a precaution against escape during a transfer.

(B) On medical grounds by direction of a medical doctor.

(C) By order of the jail administrator or his appointed representative, if other methods of control fail, in order to prevent a prisoner from injuring himself or others or from damaging property; in such instances the jail administrator or his representative shall at once consult a medical doctor.

(iii) Instruments of restraint shall not be applied for any longer length of time than is absolutely necessary. All use of restraints shall be recorded on inmates' files.

37 Penna. Code §95.241(a)(7).

pension to effectuate the employer's disciplinary objective.

The County of Centre and Centre County Prison Board (Respondents) petitioned the Court of Common Pleas of Centre County to modify, correct, or vacate the award of the arbitrator. On September 5, 1985, the trial court corrected the award by sustaining the Guards' discharge by the Prison Board. The Guards contend that the trial court erred in reversing the decision of the arbitrator. We disagree.

The Pennsylvania Supreme Court adopted[3] the "essence test" as the standard of judicial review of arbitration awards. *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977), quoting *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596. The United States Supreme Court first announced this standard in *Enterprise Wheel and Car Corp.*:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of award.

---

[3] In *Community College of Beaver County*, the Pennsylvania Supreme Court was interpreting the Arbitration Act of 1927, 5 P.S. §§161-181, however, the language in question was substantially retained in the new legislation. *See* The Uniform Arbitration Act, October 5, 1980, P.L. 693, No. 142 §501(a); 42 Pa. C.S.A. §7302(d)(2).

In *Community College of Beaver County,* the Pennsylvania Supreme Court interpreted this standard of review, and stated that if the arbitrator's interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention it is to be respected by the judiciary.

In reviewing the arbitrator's award in the instant case then, we will examine the issue, as framed by the arbitrator, and the result. Our purpose is to ensure that the authority granted has not been exceeded and that the conclusion draws its essence from terms of the Agreement. The law is clear that the authority of an arbitrator is limited by the terms of the collective bargaining agreement. *Division 85, Amalgamated Transit Union v. Port Authority of Allegheny County,* 62 Pa. Commonwealth Ct. 528, 437 A.2d 105 (1981).

The authority granted to the arbitrator can be found in Article XXII, Section 3(a) and Article XX, Section 4 of the Agreement which states in pertinent part:

> *Section 3:* (a) The arbitrator shall have no power or authority to add to, subtract from, or modify the provisions of this Agreement in arriving at a decision of the issue or issues presented and shall confine his decision solely to a determination of the facts and application and interpretation of this Agreement. . . .
>
> *Section 4:* Should a grievance over discharge or discipline go to arbitration for determination, *the sole question to be decided by such arbitrator shall be a question of fact as to whether or not such employee was discharged for just cause . . .* (Emphasis added.)

In accord with the aforementioned grant of authority, the sole question to be decided by the arbitrator is

whether there was just cause for discharge. To the contrary, the arbitrator framed the issue as follows:

Did the Employer have just cause to discharge the grievants on August 30, 1984, and, if not, what is the appropriate remedy.

Our review of the Agreement reveals no provision which grants an arbitrator the authority to fashion a penalty once just cause has been determined. Article XX, Section 1 states: "The sole right to discipline and discharge employees for just cause is retained by the county." Further, Article IV, Section 1, specifically reserves to the county the "right to discipline employees, including the right to suspend, lay off, demote and/or discharge employees for just cause. . . ." Upon reaching a just cause determination, the authority of the arbitrator was at an end. Therefore, the substitution of a four-week suspension for discharge was not within the authority of the arbitrator, and as a matter of law, it may not be upheld.

Section 501(a) of the Uniform Arbitration Act empowers a court to review an arbitrator's award:

. . .

a court in reviewing an arbitation [sic] award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment nothwithstanding [sic] the verdict.

Uniform Arbitration Act, October 5, 1980, P. L. 693, No. 142 §501(a); 42 Pa. C.S.A. §7302(d)(2). In the instant case, the Guards argue that the just cause determination is a finding of fact which must be upheld if supported by the evidence viewed in a light most favorable to the award winner. This standard, they contend,

is applicable because in passing on a Motion for Judgment n.o.v., findings of fact will not be disturbed if supported by evidence. However, in *Community College of Beaver County,* the Court emphasized that the "essence test" is the standard of review of an arbitrator's award:

> While introduction of the 'n.o.v.' concept into the field of arbitration may have been a new departure, it is hardly a radical change, nor does it dictate that a much closer or different scrutiny of an arbitration award will be available than under the approach of Enterprise Wheel and Car.

*Community College of Beaver County,* 473 Pa. 576, 589-590, 375 A.2d 1267, 1273 (1977).

The "essence test" requires the court to set aside an arbitrator's award which is unreasonable and does not draw its essence from the Agreement. *Philadelphia Housing Authority v. Union of Security Officers,* 500 Pa. 213, 455 A.2d 625 (1983). Therefore, the just cause determination is reviewable to ensure that it is reasonable and draws its essence from the Agreement.

The trial court considered *Philadelphia Housing* controlling in the determination of the present dispute. The trial court held that the arbitrator's award was not reasonable. We agree. In *Philadelphia Housing,* a security guard of the Philadelphia Housing Authority was discharged for defrauding an elderly tenant. There was a collective bargaining agreement which provided that "[T]he authority may for just cause take whatever disciplinary action it deems appropriate at its discretion." The arbitrator found that the security officer induced the tenant to part with his money by playing on their personal friendship. The arbitrator concluded that although some disciplinary action was appropriate, discharge was too severe. He reinstated the security officer and determined that the loss of back pay for eight months was "sufficient punishment".

On appeal, the Pennsylvania Supreme Court reviewed the arbitrator's award to ensure that it was reasonable. Specifically, the Court considered the arbitrator's reasoning when he concluded that discharge was not warranted because the security officer induced the tenant to part with his money as a result of their personal friendship and not by taking advantage of his position as a security officer:

> Such a distinction, however, does not mitigate the severity of the offense or justify the arbitrator's reversal of the Authority's decision to discharge a dishonest employee. The defrauding of an elderly tenant, whether by friend or stranger, by a housing authority security officer is unquestionably conduct justifying the officer's discharge. Indeed, such dishonest conduct constitutes an affront to the integrity of the entire Housing Authority security force . . . it is manifestly unreasonable to conclude that the Housing Authority could have intended to bargain away its absolute responsibility to ensure the integrity of its housing security force by discharging an officer who has defrauded one of the very people whom he is paid to protect. *Having found that the security officer Green had defrauded an elderly tenant and then lied about his conduct, the arbitrator was without authority to overturn the Authority's discharge of Green.*

*Philadelphia Housing,* 500 Pa. 213, 216, 455 A.2d 625, 626 (1983). (Emphasis added.)

In the instant case, the arbitrator made the following findings:

> The evidence in this case reveals *conclusively* that Brachbill and Musser *committed abusive acts toward Riggleman which were beyond the scope of their professional duties and quite*

*possibly violated state regulations.* But the evidence is also undisputed that horseplay, which was at least similar in kind if not degree, had been tolerated at the prison for a long period of time. There is no indication in the record that any meaningful steps were ever taken to eliminate it or that any employee prior to Brachbill and Musser had ever been disciplined for the specific offense. Consequently, their discharges contravened one of the fundamental requisites of 'just cause'—that is, the fair and non-discriminatory enforcement of rules.

. . .

All of the Union witnesses stated that *grievants' misconduct was deserving of some punishment.* Acting Warden Immel, who serves as the ranking managerial employee at the prison, stated that a two or four week suspension was a proper penalty. Finding that there was no cause for discharge, the Arbitrator accepts the recommendation of Acting Warden Immel that a four-week suspension will effectuate the employer's disciplinary objectives.

(Emphasis added.)

The fact that similar conduct previously went unpunished does not mitigate the severity of the Guards' conduct. The unauthorized shackling and cuffing of the inmate, the forced application of Ben Gay to the inmate's penis and testicles and the forcible insertion of a 2-inch spout into the inmate's anus is unquestionably conduct justifying the Guards' discharge. Having found that the guards "conclusively . . . committed abusive acts" against the inmate, and that their conduct was "deserving of some punishment", the arbitrator was without authority to overturn the discharge by the Board in whom the managerial prerogative to dispense

discipline was vested[4]. An arbitrator, as stated by the United States Supreme Court, "does not sit to dispense his own brand of industrial justice." *Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596 (1960).

> We agree with the trial court's holding that . . . it is unreasonable to conclude that the County and the Prison Board intended to bargain away its absolute responsibility to insure the safety and humane treatment of the inmates under its control. The conduct that the arbitrator found to have occurred is shocking, inhuman, degrading and bizarre.

We hold that the arbitrator's decision to reinstate the Guards and impose a four-week suspension exceeded his authority. Further, his just cause determination was unreasonable and did not draw its essence from the terms of the Agreement. Therefore, the order of the Court of Common Pleas of Centre County must be affirmed.

As the resolution of this appeal is encompassed within the standard of review of arbitration awards, we

---

[4] Article IV, Section 1 of the Agreement reads as follows: *Section 1:* It is understood and agreed that all rights heretofore exercised by the County and matters of inherent managerial policy are reserved exclusively to the County as part of its management rights unless they are expressly contracted away by a specific provision of this Agreement and such rights are not subject to the grievance or arbitation [sic] provisions of this Agreement. The County shall have the sole and exclusive right to exercise of any such rights and functions of management. . . . The County shall have the right to discipline employees, including the right to suspend, lay off, demote and/or discharge employees for just cause. The above management rights are not to be interpreted as being all-inclusive, but merely indicate the type of rights which belong to and are inherent to management.

need not address Respondent's contention that the arbitrator's award was contrary to public policy. In view of our affirmance of the court of common pleas, we need not address the Guards' request for attorney's fees and delay damages.

## ORDER

AND NOW, October 3, 1986, the order of the Court of Common Pleas of Centre County at No. 85-587, dated September 5, 1985, is affirmed.