548 A.2d 1194

**COUNTY OF CENTRE, Centre County Prison Board, Appellees,**

v.

**Darrell MUSSER, Steven Brachbill, District 1199P National Union of Health Employees, AFL–CIO, Appellants.**

Supreme Court of Pennsylvania.

Argued May 9, 1988.

Decided Oct. 17, 1988.

---

Joseph M. Devecka, State College, for appellants.

John W. Blasko, State College, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

NIX, Chief Justice.

The subject of this appeal is an order of a common pleas court reversing an award by a labor arbitrator and sustaining the discharge of two county employees. When the trial court's order was affirmed by the Commonwealth Court, the involved employees and their labor union successfully petitioned us for further review pursuant to section 724(a) of the Judicial Code, 42 Pa.C.S. § 724(a).

The employee-appellants, Darrell Musser and Steven Brachbill, worked as guards at the county prison of Centre County. In late August of 1984, Officers Musser and Brachbill were dismissed from their positions, as a result of acts committed by them against a prison inmate, one Robert Riggleman. Based on the factually supported findings of the labor arbitrator referred to above, the acts in question may be described as follows:

In the evening of August 10, 1984, Officer Musser tricked Riggleman into going to a certain area in one of the prison dormitories. Upon Riggleman's arrival, Officers Musser and Brachbill seized him, wrestled him to his knees and put a pillowcase over his head. Assisting the two guards in this action was another inmate, named Nicholas. The pillowcase was full of shaving cream, and the three assailants proceeded to rub it repeatedly over Riggleman's head and face. When the cream got into Riggleman's mouth and nose, he began to have difficulty breathing. After a few moments the pillowcase was removed, at which point someone snapped Riggleman's picture. Riggleman emerged from the episode cursing and yelling at the three men; he then went to a lavatory to wash his face and head. Officer

Musser, not yet done with the affair, put another handful of shaving cream on Riggleman's head.

The next day, August 11, Riggleman was again set upon by the trio of Musser, Brachbill and Nicholas. Brachbill and inmate Nicholas held Riggleman while Musser went to obtain a tube of Ben–Gay ointment from the medical supply room. When Musser returned, Brachbill and Nicholas pulled down Riggleman's trousers; and Musser applied the ointment to the captive's penis and testicles. Matters did not stop with the Ben–Gay incident. A short time later, after Riggleman had gone to shower and change his clothes, he was confronted anew by Brachbill, Nicholas and a guard named Goodrow. The two guards and Nicholas handcuffed Riggleman to a gate, with his hands being wrapped around one of its bars. They also shackled his ankles. One of the three captors then produced a paper bag, inscribed upon it a homosexual allusion, and put it over Riggleman's head. With Riggleman thus displayed, one of the captors photographed him. Shortly thereafter, a Lieutenant Bodge came upon the scene and ordered that Riggleman be freed from the handcuffs and shackles. That instruction was complied with—at least temporarily.

Evidently, the command given by Lieutenant Bodge did not have a lasting effect on either Goodrow or Nicholas. Later that same day, August 11, 1984, Goodrow and Nicholas again joined forces to re-acquaint Riggleman with the handcuffs and the shackles. This time they held Riggleman down between two desks and shackled each of his ankles to a desk leg. They also cuffed his hands and secured the handcuffs to a candy machine by means of a belt. Officer Musser came upon the scene and joined in by sitting on Riggleman's stomach. Next, Officers Musser and Goodrow used a felt-tip pen to mark his body. The two guards drew circles around Riggleman's nipples, marked his face, put stripes on his penis, and wrote the names of two known homosexuals on his buttocks. Following that event, Riggleman was freed from the desks, but was kept in the handcuffs and shackles for an additional period of time.

Brachbill, Musser, and Nicholas continued with their sport the next day, August 12. About seven o'clock that evening, Brachbill and Nicholas grabbed Robert Riggleman and pinned him to the floor. While Riggleman was thus restrained, Musser approached carrying a spouted, plastic bottle filled with water. Musser then proceeded to inject the bottle's spout into Riggleman's anus, and by that means emptied the water into his body. Upon the completion of that mission the three perpetrators ran from the scene.

The final series of events occurred during the evening of August 13, 1984. Musser and Brachbill accosted Riggleman and put him to the choice of having his head shaved or his testicles shaved. After the inmate had weighed the options given, Musser and Brachbill escorted him to a chair where they then proceeded to cut all the hair from his head and to shave it.

Riggleman's term of incarceration at the Centre County Prison expired on August 14, 1984. During a pre-release interview with a counselor, Riggleman revealed, upon inquiry, that the appearance of his head was the work of guards Musser and Brachbill. The counselor reported the head-shaving incident to the prison authorities, who then had the Deputy Warden look into the guards' behavior. The investigation brought to light the various acts committed by the guards against Riggleman during his last four days at the prison. Riggleman was at first reluctant to lodge a complaint or press charges; in his view the incidents were merely "horseplay" between friends. However, at the urging of the Deputy Warden, he changed his mind and decided to cooperate with the prison authorities in taking disciplinary action against Musser and Brachbill. Soon thereafter, the prison Warden submitted a report to the Centre County Prison Board, recommending that Officers Musser and Brachbill be discharged for physical abuse of inmate Riggleman and shackling him in violation of state regulations. On August 30, 1984, the Prison Board accepted the Warden's recommendation and notified the two guards of their dismissal.

The guards at the Centre County Prison were represented by District 1199P National Union of Hospital and Health Care Employees, AFL–CIO ("Union"). The Union, challenging the discharge of Musser and Brachbill, filed a written grievance pursuant to the Collective Bargaining Agreement ("Agreement") in force between Centre County and the Union. The parties met in conference, as required by the Agreement; but the Prison Board affirmed its decision to terminate the two guards, citing the employee discipline provisions of the Agreement.

Article IV of the Agreement sets forth the general proposition that all matters "of inherent managerial policy" are reserved exclusively to the County unless they have been expressly contracted away by some specific provision of the Agreement. This same Article also states: "The County shall have the right to discipline employees, including the right to suspend, lay off, demote and/or discharge employees for *just cause*." (Emphasis added.) However, the County's right to discipline or discharge employees is addressed more specifically by another part of the Agreement, Article XX.

Article XX, in the parts here pertinent, reads as follows:

## DISCIPLINE

*Section 1:* The sole right to discipline and discharge employees *for just cause* is retained by the County. The County will follow principles of correcting discipline with respect to minor offenses; that is, ι written warning for first offense; disciplinary layoff for second offense; and discharge for the third offense. If an employee believes he or she has been disciplined without just cause, he may file a grievance within five (5) days of date of discipline. The first written warning may be withdrawn within one year, unless during such year the employee receives another warning.

*Section 2:* The following are grounds for immediate dismissal, which are not subject to arbitration, except insofar as Section 4 of this Article XX is applicable:

a) Drinking of alcoholic beverages or using drugs during working hours, or reporting for work under the influence of alcohol or drugs.

b) Commission of physical violence to employees.

c) Stealing of money, material or equipment.

d) Carrying an unauthorized concealed weapon when reporting or during working hours.

e) Sleeping on the job or during working hours.

f) Conviction of a crime.

\* \* \* \* \* \*

*Section 4:* Should a grievance over discharge or discipline go to arbitration for determination, *the sole question to be decided by such arbitrator shall be a question of fact as to whether or not such employee was discharged for just cause.* If an arbitrator finds an employee was discharged without just cause or laid-off contrary to the terms of this Agreement, the arbitrator may award back pay less (a) any amount received from any unemployment or other compensation sources received during the period; (b) a deduction for federal, state, or local taxes and other items normally deducted shall be withheld. There shall be no payment for any period of delay caused by the action of the discharged employee or Union. (Emphasis added.)

The Union, contending that the dismissals in question were not based on "just cause," notified the Prison Board of its intent to take the matter to arbitration under the terms of the Agreement.

In the proceedings before the arbitrator, there was no dispute as to whether Musser and Brachbill committed the deeds which formed the basis for their dismissal. The County's evidence in that regard was uncontradicted. The sole point of controversy was whether the conduct of the two guards provided "just cause" for their discharge. The County, in support of its position, brought out that Musser and Brachbill, like all guards at the prison, had been given instruction as to state regulations governing the treatment of inmates and the use of physical restraints, such as

handcuffs, and shackles. Thus, according to the County, the two grievants were aware, or should have been aware, that their treatment of Riggleman violated state law.[1] The employer also asserted that the conduct in question, besides being blatantly unprofessional, could have exposed the County to civil liability.

The first contention advanced by the Union was that the only infractions which warranted immediate discharge under the Agreement were those specified in section 2 of Article XX, and that the offenses charged against Musser and Brachbill did not come within any of the ones listed in that class. That argument was rejected by the arbitrator on the basis of his conclusion that the provision referred to did not delimit the employer's power of immediate dismissal. The Union next contended that the sanction of discharge was too severe for the behavior involved, and that nothing more than a suspension was justified.

The arbitrator found that the grievants' conduct toward Riggleman was a clear violation of professional standards, and that their acts, in several respects, probably violated state regulations governing the treatment of prison inmates. The arbitrator also determined that the conduct of the grievants was cause for disciplinary action of some type. He decided, however, that the penalty of dismissal was inappropriate. In concluding that a lesser sanction was called for, the arbitrator accepted two of the Union's assertions: (1) that the conduct in question was merely "horseplay" between friends; and, (2) that "horseplay" between guards and inmates had been long tolerated at the prison without ever before causing the discharge of a guard. Based on the two findings last mentioned, the arbitrator decided that the Prison Board's termination of Musser and Brachbill was discriminatory and, for that reason, could not be found to rest upon "just cause." The arbitrator then proceeded to enter an award reducing each of the dismissals

1. Administrative regulations found at 37 Pa.Code § 95.241 set forth specifically limited circumstances under which a prison inmate may be subjected to physical force and instruments of restraint, all related to the need to protect persons or property, or to prevent escape.

to a four-week period of suspension. His award also stated that he was to retain jurisdiction to resolve the question of back pay.

In response to the arbitration award, the County and the Prison Board joined in a petition to the Court of Common Pleas of Centre County, requesting the court to sustain the discharges or, in the alternative, vacate the award. Their petition, labeled as one to "modify, correct or vacate an arbitration award," sought relief pursuant to section 7302(d)(2) of the Uniform Arbitration Act ("Uniform Act"), 42 Pa.C.S. § 7302(d)(2). That statutory provision states as follows:

> Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is *contrary to law* and is such that had it been a verdict of a jury *the court would have entered a different judgment or a judgment notwithstanding the verdict.* (Emphasis added.)

By virtue of section 7302(d)(1)(ii), the above-quoted provision applies to labor arbitration awards against political subdivisions. In seeking relief under section 7302(d)(2), the County and the Prison Board asserted that the arbitrator's award, with regard to the issue of "just cause" for discharge, was contrary to law, was violative of the terms of the Collective Bargaining Agreement, and was such as would have required the court to enter a different judgment had the award been a jury verdict.

The court of common pleas held that section 7302(d)(2) of the Uniform Act defined its scope of review in the matter. That section, as its language clearly indicates, is a mandate to the courts concerning their review of arbitration awards covered by the section. The provision directs that a reviewing court *shall* modify or correct an award if the award is contrary to law and is such that, had it been a jury verdict, it would not have survived a motion for judgment *non obstante verdicto.* The common pleas court in the instant

case, having so framed its scope of review, proceeded to conclude that the arbitrator's award was against public policy and thus invalid.

In concluding that the award could not stand, the trial court relied on our decision in *Philadelphia Housing Authority v. Union of Security Officers # 1*, 500 Pa. 213, 455 A.2d 625 (1983). The *Philadelphia Housing Authority* case, like the present one, concerned an award by a labor arbitrator reversing the discharge of a governmental employee. The employee there involved, a security guard at a public housing project, had been dismissed for defrauding an elderly tenant. Although the arbitrator found, as the employer had alleged, that the security guard had committed the fraud and had lied about his conduct, an award was entered reinstating the guard to his former position. That decision was based on the arbitrator's determination that the guard's fraud resulted from an abuse of friendship, not abuse of his official status. This Court declared the award to be invalid. We held that, given the infraction proved, the terms of the collective bargaining agreement did not empower the arbitrator to reverse the discharge. We characterized as "manifestly unreasonable" the arbitrator's implicit conclusion that the employer had bargained away, under the agreement, its absolute responsibility to ensure the integrity of its security guards by the power of dismissal. *Philadelphia Housing Authority*, 500 Pa. at 216, 455 A.2d at 627.

The trial court in the instant matter, finding present the same considerations that shaped our decision in *Philadelphia Housing Authority*, entered an order correcting the arbitration award so as to sustain the discharge of Musser and Brachbill. The two grievants and the Union followed with an appeal to the Commonwealth Court.

The Commonwealth Court affirmed the decision of the common pleas court, although, in doing so, it differed from the lower court in articulating the standard of judicial review applicable to the award *sub judice*. 101 Pa.Cmwlth. 193, 515 A.2d 1027. According to Commonwealth Court,

the governing standard of review is the "essence" test set forth by this Court in *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA),* 473 Pa. 576, 375 A.2d 1267 (1977). Under the "essence" test, which we shall more fully detail at a later point herein, an arbitrator's award is to be respected by the courts if it represents a reasonable interpretation of the labor agreement between the parties. *Id.* The Commonwealth Court, in applying the "essence" test in the present case, determined that the arbitrator's award exceeded the authority conferred upon him by the labor Agreement between the County and the Union. The court stated that, once the arbitrator found that the two grievants had committed the misconduct here involved, the question of appropriate discipline was a matter reserved by the Agreement to the employer. In that regard, the Commonwealth Court held that our decision in *Philadelphia Housing Authority, supra,* was controlling. Based on those reasons, the intermediate appellate court decided that the arbitration award was properly reversed.

The grievants and the Union, maintaining that a proper adherence to the standard of judicial review compels affirmance of the arbitrator's award, petitioned this Court for an allowance of appeal. Because of the importance of the considerations involved, and the apparent need for further explication of the law bearing upon this controversy, we granted the petition.

■ We begin by pointing out that the Commonwealth Court correctly identified the applicable standard of judicial review. By our decision in *Community College of Beaver County, supra,* we held that, with respect to public-employee arbitration awards subject to the Arbitration Act of 1927,[2] judicial review was to focus on the question of whether the award represented a reasonable interpretation of the collective bargaining agreement. That standard, later to become known as the "essence" test, was derived by this Court from federal decisions under section 301 of

2. Act of April 25, 1927, P.L. 381, *as amended,* 5 P.S. § 161 *et seq.*

the federal Labor Management Relations Act, 29 U.S.C. § 185. The most notable of those federal cases was the decision of the United States Supreme Court in *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), whose language and reasoning we expressly adopted in *Community College* for purposes of defining the standard of judicial review under this state's 1927 arbitration statute.[3]

In the *Enterprise Wheel and Car* case, the Supreme Court put forth the general idea that judicial intervention in labor arbitration awards was to be very limited, stating that, "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements." 363 U.S. at 596, 80 S.Ct. at 1360. In connection with that view, the Supreme Court added that, "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Id.* According to the reasoning in *Enterprise Wheel and Car*, the arbitrator's interpretation of the collective bargaining agreement is one of the things for which the parties bargained; "and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." 363 U.S. at 599, 80 S.Ct. at 1362.

Although *Enterprise Wheel and Car* was, in large part, a pronouncement for judicial deference to arbitration awards under labor agreements, the Supreme Court added the following important and well known caveat:

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He

---

**3.** As is well known, *Enterprise Wheel and Car* was one of three related cases decided the same day and now referred to as the "Steelworkers Trilogy." The other two cases were *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) and *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

may of course look for guidance from many sources, *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. 363 U.S. at 597, 80 S.Ct. at 1361 (emphasis added).

The above quotation provided the conceptual core of the "essence" standard adopted by this Court in *Community College of Beaver County, supra.* As a further formulation of the standard, we stated in effect that an award is to be respected by the judiciary if the award " 'can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention....' " *Community College of Beaver County,* 473 Pa. at 594, 375 A.2d at 1275 (quoting *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir.1969)). *See Lewisburg Area Education Ass'n. v. Board of School Directors, Lewisburg Area School District,* 474 Pa. 102, 376 A.2d 993 (1977). In adopting the "essence" standard, or test, we concluded that it was consistent with the provisions for judicial review contained in the Arbitration Act of 1927, and, in particular, with the standard of review previously put forth in *International Brotherhood of Firemen and Oilers, AFL–CIO Local 1201 v. School District of Philadelphia,* 465 Pa. 356, 350 A.2d 804 (1976). In that decision, which addressed the provisions in the 1927 act for modifying or correcting an arbitration award, we had held that the arbitrator's interpretation of the labor agreement was to be upheld if it was a reasonable one. *Id.,* 465 Pa. at 366, 350 A.2d at 809.

Although the Arbitration Act of 1927 was superseded in 1980, subsequent to the *Community College* case, the statute's provisions relative to judicial review of arbitral awards were retained in the superseding legislation, the present Uniform Arbitration Act. For example, section 7302(d)(2) of the Uniform Act, under which the instant appellees sought relief from the award here in question, is

substantially a reenactment of section 11(d) of the 1927 statute (formerly 5 P.S. § 171(d)). *Pennsylvania State Education Ass'n. v. Appalachia Intermediate Unit 08,* 505 Pa. 1, 476 A.2d 360 (1984). It is thus clear that the "essence" test remains the standard of judicial review for arbitration awards which, like the one at bar, are subject to section 7302(d)(2) of the Uniform Act and are challenged under that provision. *Id.*

In the case instantly before us, the appellants contend that the courts below, in reversing the arbitration award, exceeded the limits of proper judicial review and thus exceeded their judicial authority. This argument starts with the appellants' premise that the Collective Bargaining Agreement between the County and the Union empowered the arbitrator to alter the employer's disciplinary decision in this matter. Having made that assumption, the appellants next emphasize the arbitrator's finding that the grievants' misconduct was "horseplay" and his further finding that "horseplay" between guards and inmates had long been tolerated by the prison authorities. Those two findings, the appellants argue, established a circumstance which, under the Agreement, empowered the arbitrator to lighten the discipline to be imposed. In sum, they argue that the award was a rational derivative of the Agreement and as such should not be disturbed by the courts. As for our decision in *Philadelphia Housing Authority v. Union of Security Officers # 1, supra,* the appellants assert that it is significantly distinguishable from the present case.

Given the nature and scope of judicial review under the "essence" test, we must begin our resolution of this appeal by focusing on the Collective Bargaining Agreement itself. As noted previously in this opinion, Article IV of the Agreement expressly reserves to the County *"the right to discipline employees,* including the right to suspend, lay off, demote and/or discharge employees *for just cause."* (Emphasis added.) This reservation of power is reiterated in Article XX, which more specifically addresses the subject of employee discipline. The very first sentence in section 1 of

Article XX states: "The *sole right* to discipline and discharge employees for just cause *is retained by the County*." (Emphasis added.) That clause is tempered by a provision concerning "minor offenses"; for offenses of that type the employer agreed to follow a scheme of graduated discipline, starting with a written warning for the first offense, progressing to a "disciplinary layoff" for the second, and ending in discharge for the third.

Section 1 of Article XX also confers upon an employee the right to grieve any discipline imposed upon him, should he dispute the existence of "just cause." Section 4 of that same Article sets forth the powers of an arbitrator regarding employee discipline. Where the matter grieved is a discharge, section 4 provides that "the *sole question* to be decided by [the] arbitrator shall be *a question of fact as to whether or not such employee was discharged for just cause*." (Emphasis added.)

The plain language of the Agreement's disciplinary provisions points to a conclusion that employee discipline, as a general matter, was to remain within the exclusive power of management. Articles IV and XX of the Agreement clearly set forth that understanding. Indeed, the arbitrator recognized as much in his discussion. Besides the express limitation that any disciplinary action must rest on a factual basis constituting "just cause," the only other contractual limitation on the employer's power to discipline relates to a class of employee misconduct denominated "minor offenses," for which the employer has bound itself to follow a scheme of graduated, or progressive, sanctions. The arbitrator's power regarding disciplinary decisions is carefully circumscribed by section 4 of Article XX: he is restricted to deciding whether or not the requisite factual predicate exists for the imposition of discipline, and whether the disciplinary measure selected by the employer is in accordance with the terms of the Agreement.

Under the power arrangement embodied in the Agreement, once the arbitrator determines that "just cause" existed for the employer to discipline a worker, the sanction

selected by the employer is beyond modification by the arbitrator, unless it is a penalty which violates the provision relating to "minor offenses." Unless the latter provision applies, the Agreement does not empower the arbitrator to determine what is the appropriate discipline.[4]

Since the arbitrator in this case decided that grievants Musser and Brachbill were deserving of suspension, the unavoidable implication is that he determined that their conduct presented "just cause" for discipline *of some type.* Furthermore, by concluding that suspension was the appropriate first sanction, it is obvious that the arbitrator did not deem the grievants' conduct as coming within the provision for "minor offenses." Consequently, since it is clear that there existed "just cause" for the employer to impose discipline of *some type,* and since the provision for graduated punishment did not apply, the nature of the discipline to be imposed remained the exclusive province of the employer. When the arbitrator took it upon himself to modify the employer's decision of dismissal, the arbitrator stepped beyond the bounds of power conferred upon him by the Collective Bargaining Agreement. It is worth noting that, according to the arbitrator, the Prison Board could reasonably have decided upon dismissal based on the information it had. As a ground for overruling the Board's decision, the arbitrator "inferred" that the Board was not aware of the history of "horseplay" at the prison. However, even if the arbitrator was correct in that surmise, it does not provide a consideration which would limit the employer's contractual power to impose discipline for conduct constituting "just cause."

The county prison of Centre County is not a private enterprise whose managers may totally bargain away their powers. The prison is a governmental institution whose

4. Another provision in the Agreement, section 3(a) of Article XXII, states in material part that:
    The arbitrator shall have no power or authority to add to, subtract from, or modify the provisions of this Agreement in arriving at a decision of the issue or issues presented and shall confine his decision solely to a determination of the facts and application and interpretation of this Agreement....

administrators are charged with governmental functions and duties, many of which are codified in statute and regulation. Under the mandate of section 1 of the Act of May 16, 1921, P.L. 579 *as amended,*[5] the Prison Board of Centre County is exclusively vested with the governance and management of the county prison, and with the safe-keeping of inmates. If the Board is to carry out its duty relating to the safe-keeping of prisoners, the Board must have the unfettered power to discharge an employee who is found to have subjected an inmate to physical abuse.

Clearly, the grievants' acts of handcuffing and shackling prisoner Riggleman in violation of state regulations, and the act of forcibly subjecting him to an enema, come within the category of physical abuse. We can ascertain nothing in the Collective Bargaining Agreement to suggest that the arbitrator had the power to overrule the employer's disciplinary decision regarding such conduct. Thus, the courts below were correct in applying to this case the reasoning of our decision in *Philadelphia Housing Authority v. Union of Security Officers #1, supra.*[6] The fact that the outrageous conduct here involved was perpetrated for the fun and frolic of the guards is hardly a basis for exempting it from the employer's full disciplinary power. Equally un-compelling is the arbitrator's finding that "horseplay" was historically common at the prison. The two guards here involved did not have a prescriptive right to violate the law as they did.

For the reasons set forth herein, we conclude that the arbitration award *sub judice* was not rationally derived from the Collective Bargaining Agreement, and thus was properly set aside.

Accordingly, the order of the Commonwealth Court is affirmed.

5. 61 P.S. § 408.

6. Although the decision in *Philadelphia Housing Authority* came after our adoption of the "essence" test but does not mention it, the considerations underlying the decision are a necessary part of the "essence" standard in cases where governmental functions are implicated.

LARSEN, J., files a concurring opinion in which PAPADAKOS, J., joins.

ZAPPALA, J., concurs in the result.

LARSEN, Justice, concurring.

I join the majority opinion. I wish to emphasize that, as the majority observes, judicial intervention in labor arbitration awards is and should be the rare exception. So long as the arbitrator "essentially" (i.e., reasonably) derives the award from the collective bargaining agreement, the award will not be disturbed.

Here, however, as in *Philadelphia Housing Authority v. Union of Security Officers #1*, 500 Pa. 213, 455 A.2d 625 (1983), the union did not bargain for and the employer did not bargain away the right and responsibility of the employer to discharge an employee who is guilty of the atrocious criminal conduct that we witness in these cases. In the instant case, the sustained physical abuse, humiliation and torture of the victim-inmate (which is undisputed) in the guards' "care" (e.g., handcuffing and shackling, forced enemas, shaving of hair, exposing private areas, inflicting pain to and offensive touching of the genitals and buttocks, etc.), clearly violated the criminal laws of this Commonwealth prohibiting, inter alia, rape, involuntary deviate sexual intercourse and assault. A public employer cannot bargain away its right and responsibility to discharge an employee for such egregious criminal behavior occuring in the performance of the employee's duties; such a bargain would violate public policy. The Centre County Prison Board did *not* attempt to bargain away that right and responsibility, and the arbitrator in this case, without a doubt, roved far beyond the collective bargaining agreement to dispense his own notion of justice. This award cannot be permitted to stand.

PAPADAKOS, J., joins in this concurring opinion.