633 A.2d 1278

**PENNSYLVANIA STATE POLICE, Petitioner,**

**v.**

**PENNSYLVANIA STATE TROOPERS' ASSOCIATION (Trooper James BETANCOURT), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted April 8, 1992.

Decided Nov. 8, 1993.

Joanna N. Reynolds, Asst. Counsel, for petitioner.

James L. McAneny, for respondent.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

PELLEGRINI, Judge.

The Pennsylvania State Police (State Police) appeal from an arbitration award sustaining the grievance of the Pennsylvania State Troopers' Association (Union) and Trooper James Be-

tancourt and holding that Trooper Betancourt did not engage in "Unbecoming Conduct." [1]

On February 24, 1988, Trooper Betancourt was on duty in the "Warrants and OR Section" at Troop "K" Headquarters. In the early afternoon hours, Trooper Betancourt was engaged in a jovial conversation with Trooper Francine Taggart while working in the office. At some point during the conversation, following a quip by Trooper Taggart that Trooper Betancourt would be a "half-man luge team" in reference to the Winter Olympic sport, Trooper Betancourt turned away and exposed his penis. Although there were eight other troopers present in the office, including Trooper Taggart, this action was observed purportedly by only Trooper Carlton Watson, who happened to be behind Trooper Betancourt.

Information concerning this episode came to the attention of Sergeant John Lyle, "Warrants and OR Supervisor", who questioned Trooper Betancourt. After initially denying the allegations, Trooper Betancourt admitted he exposed himself in the office. Sergeant Lyle initiated a complaint with the Bureau of Professional Responsibility and placed Trooper Betancourt on restrictive duty for a period of two months, where he was required to scrub the office floors on his hands and knees. As a result of the complaint, Trooper Betancourt was charged with Unbecoming Conduct, a violation of Section 1–1.01 of the State Police Field Regulations (Field Regulations).

On March 30, 1989, court-martial proceedings were held before the State Police Court–Martial Board concerning the charge of Unbecoming Conduct. The Court–Martial Board then filed a report with the Commissioner, finding Trooper Betancourt guilty of Unbecoming Conduct and recommending a 30–day suspension without pay. On April 24, 1989, the Commissioner agreed with the Court–Martial Board's recommendations and found Trooper Betancourt guilty of Unbecoming Conduct and imposed a 30–day suspension. Pursuant to a newly adopted grievance procedure, Trooper Betancourt chose

1. This opinion was reassigned to the author on May 11, 1993.

to grieve his suspension and hearings were held before an arbitrator.[2]

On April 1, 1991, the arbitrator issued an award sustaining Trooper Betancourt's grievance, finding that the conduct did not fall within the definition of Unbecoming Conduct, because, while Trooper Betancourt exposed himself, it did not occur in public and some of his fellow officers condoned his behavior. The arbitrator also awarded Trooper Betancourt lost wages and benefits he suffered while on restrictive duty and suspension and directed that the incident be expunged from his personnel file. The State Police now appeal.[3]

## I.

■ We ordered reargument in this case because of the difficulty we are having with what standard of review to apply in reviewing grievance arbitration awards arising out of collec-

2. *See* Section 5 of Article XXXVIII of the 1990–1992 Collective Bargaining Agreement between the State Police and the Union, which allows a police officer charged with an offense subject to court-martial to elect either court-martial or grievance arbitration. (R.R. 3a). The present case is unusual in that Trooper Betancourt received both a court-martial and grievance arbitration.

The reason for this unusual circumstance is that prior to the charge of Unbecoming Conduct being brought against Trooper Betancourt, a decision of this court held that the provision allowing an officer to elect grievance arbitration as an option to court-martial proceedings contravened the statutory scheme under Section 711 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 251, which outlines the court-martial procedures and the powers of the Commissioner. This decision was subsequently reversed by the Pennsylvania Supreme Court after Trooper Betancourt already was given his suspension by the Commissioner. *See Commonwealth v. State Conference of State Police Lodges of the Fraternal Order of Police (McCommons)*, 117 Pa.Commonwealth Ct. 564, 546 A.2d 697 (1988), *reversed*, 525 Pa. 40, 575 A.2d 94 (1990).

Following the Supreme Court's decision, the State Police and the Union agreed that anyone who was subject to court-martial during this time period may elect to grieve the Commissioner's decision, which is what Trooper Betancourt did.

3. We have jurisdiction of this appeal pursuant to 42 Pa.C.S. § 763(b), which provides: "The Commonwealth Court shall have exclusive jurisdiction of all petitions for review of an award of arbitrators appointed in conformity with statute to arbitrate a dispute between the Commonwealth and an employee of the Commonwealth."

tive bargaining agreements negotiated or awarded pursuant to Act 111.[4] We have previously held that the standard of review for appeal of Act 111 grievance arbitration is in the nature of "narrow certiorari". *See City of Philadelphia v. Fraternal Order of Police Lodge No. 5 (Wilson),* 129 Pa.Commonwealth Ct. 392, 565 A.2d 1232 (1989). Oftentimes, however, we lapse into essence test language in reviewing these awards with statements such as "we must limit our inquiry into [whether] the arbitrator's interpretation ... derives its essence from the collective bargaining agreement between the FOP and the City." *FOP Lodge No. 5 (Bojanowski) v. City of Philadelphia,* 137 Pa.Commonwealth Ct. 1, 5, 586 A.2d 459, 462 (1991).[5]

The State Police ask us to revisit this area. While not disputing that the narrow certiorari standard is appropriate to review "interest arbitration"[6] awards, it contends that it is inapplicable to grievance arbitration awards which should be reviewed under the standard set forth in Section 7302(d)(2) of the Uniform Arbitration Act (UAA), 42 Pa.C.S. § 7302(d)(2), the "essence test".

### A.

The "essence test" is the standard of review that is routinely applied in both the public and private sectors to review arbitration awards in grievance proceedings. It is used to review all awards under the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, No. 195, *as amended,* 43 P.S. §§ 1101.101–1101.2301 (for other public "regular" and "special" employees, commonly referred to as Act 195). The

**4.** Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10. Act 111 applies only to police and fire personnel.

**5.** *See FOP Lodge No. 5 (Christy) v. City of Philadelphia,* 120 Pa.Commonwealth Ct. 610, 549 A.2d 1014 (1988); *City of Philadelphia v. FOP Lodge No. 5 (Adams),* 114 Pa.Commonwealth Ct. 96, 538 A.2d 131 (1988); *City of Carbondale v. FOP Lodge 63 (Barbaro),* 109 Pa.Commonwealth Ct. 325, 531 A.2d 76 (1987).

**6.** Interest arbitration is the name given to the procedure that is used when parties are unable to arrive at a collective bargaining agreement. *Geriot v. Council of Borough of Darby,* 491 Pa. 63, 69, n. 6, 417 A.2d 1144, 1147, n. 6 (1980).

"essence test", as originally formulated in our case law, was that an arbitration award would be upheld if the award "draws its essence from the collective bargaining agreement." *FOP Lodge No. 5 (Wilson)*, 129 Pa.Commonwealth Ct. at 396, 565 A.2d at 1234 (citing *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977)). Stated more precisely, where the arbitrator's task has been to determine the parties' intention in drafting the collective bargaining agreement, then the arbitrator's award is based on a resolution of a factual dispute and "is to be respected by the judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention ....'." *Leechburg Area School District v. Dale*, 492 Pa. 515, 520, 424 A.2d 1309, 1312 (1981) (quoting *Community College of Beaver County*, 473 Pa. at 594, 375 A.2d at 1275 (additional citation omitted)). The essence test requires a determination of whether the agreement encompasses the subject matter of the dispute. *Leechburg*, 492 Pa. at 520–21, 424 A.2d at 1312.[7]

After enactment of the Uniform Arbitration Act[8] in Pennsylvania in 1980 (UAA), significant nuances have been added to the essence test. The UAA provides that a reviewing court is permitted to modify or correct an award in an arbitration proceeding conducted under its auspices only where "the

---

**7.** The essence test derives from federal decisions which mandate judicial deference to an arbitrator's findings. *Leechburg*, 492 Pa. at 520, 424 A.2d at 1312. The United States Supreme Court, in frequently quoted language, has held:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; *he does not sit to dispense his own brand of industrial justice.* He may, of course, look for guidance from many sources, yet *his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) quoted in *FOP Lodge No. 5 (Wilson)*, 129 Pa.Commonwealth Ct. at 396, 565 A.2d at 1234–35. (Emphasis added).

**8.** 42 Pa.C.S. §§ 7301–7320.

award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict." 42 Pa.C.S. § 7302(d)(2). Although this language introduces the judgment n.o.v./error of law concept into review of labor arbitration awards, the cases have continued to apply the "essence test" to grievance arbitration under Act 195, and have viewed the UAA's judgment n.o.v. scope of review and the "essence test" as essentially the same. *FOP Lodge No. 5 (Wilson)*, 129 Pa.Commonwealth Ct. at 396, 565 A.2d at 1235 (quoting *Community College of Beaver County*, 473 Pa. at 590, 375 A.2d at 1273 ("the 'n.o.v.' concept ... is hardly a radical change, nor does it dictate that a much closer or different scrutiny of an arbitration award will be available than under the [essence test].")

## *B.*

The other standard, narrow certiorari, a more limited standard, gives even greater deference to an arbitration award required in labor arbitration proceedings under Act 111. As developed in the "interest-arbitration" context, a court may review Act 111 arbitration awards in the nature of "narrow certiorari", limited to questions regarding: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess in exercise of the arbitrator's powers; and (4) deprivation of constitutional rights. *See Washington Arbitration Case*, 436 Pa. 168, 174, 259 A.2d 437, 441 (1969). Under this "narrow certiorari" standard of review, the courts give even greater deference to an arbitrator's award than is given in judicial review of Act 195 and other arbitration proceedings. *See, e.g., FOP Lodge No. 5 (Wilson)*, 129 Pa.Commonwealth Ct. at 401, 565 A.2d at 1237; *City of Philadelphia v. FOP Lodge No. 5 (Young)*, 125 Pa.Commonwealth Ct. 625, 558 A.2d 163 (1989); *Allegheny County Police Ass'n. v. County of Allegheny*, 100 Pa.Commonwealth Ct. 327, 514 A.2d 964 (1986), *appeal dismissed*, 516 Pa. 17, 531 A.2d 1108 (1987).

## C.

The result in a given "just cause for discipline" case can differ, depending upon whether a grievance arbitration award is reviewed under the "essence test"/UAA standards or in the nature of narrow certiorari. This difference is manifest in the "just cause for discipline" cases where an arbitrator determines a grievant committed the acts which led to imposition of discipline by the employer, but also finds that such acts do not constitute "just cause" for the discipline imposed and substitutes either some lesser punishment or none. A recurring issue in this situation is whether the arbitrator exceeded his or her authority in substituting a penalty or in overriding the employer's decision as to the appropriate discipline for the misconduct which the arbitrator found to have occurred.

In grievance arbitration under Act 195, application of the error of law/judgment n.o.v. standard of review (or the "essence test") frequently results in reversing the arbitrator's determination of no just cause for discipline for imposing his or her own "brand of industrial justice",[9] and going beyond the intention of the parties. *See, e.g., Pennsylvania Liquor Control Board v. Independent State Stores Union,* 520 Pa. 266, 553 A.2d 948 (1989) (award· was not rationally derived from CBA where arbitrator found grievant guilty of theft and other crimes against the employer, but considered other factors in mitigation in determining that there was no "just cause" for his discharge and substituted a lesser penalty); *County of Centre v. Musser,* 519 Pa. 380, 548 A.2d 1194 (1988) (award was not rationally derived from CBA which clearly retained employer's right to determine appropriate punishment for serious misconduct, and arbitrator found grievants to have engaged in charged abusive conduct to an inmate of the prison, including assaultive behavior, but arbitrator considered certain mitigating factors to find no "just cause" for dismissal and substituted a lesser penalty); *Philadelphia Housing Authority v. Union of Security Officers,* 500 Pa. 213, 455 A.2d 625 (1983) (award was not rationally derived from CBA where

9. *See* note 6.

arbitrator found grievant had committed crime of fraud against one of employer's tenants, but found no "just cause" for dismissal and substituted a lesser penalty); *Manheim Central Education Ass'n. v. Manheim Central School District,* 132 Pa.Commonwealth Ct. 94, 572 A.2d 31, *petition for allowance of appeal denied,* 525 Pa. 661, 582 A.2d 326 (1990) (award was not rationally derived from CBA where arbitrator found charged immoral conduct of grievant to have occurred, but found no "just cause" for dismissal and substituted a lesser penalty).

On the other hand, the greater judicial deference owed an arbitrator under the narrow certiorari standard usually will result in upholding such an award. As long as the proceedings were regular, violates no constitutional rights, and the arbitrator had authority over the matter, the award will be upheld. This type of review mainly looks to see if basic due process principles were followed. If they have been, we will not interfere, even if the arbitrator's award is not derived from the agreement.

In this context, we have reviewed awards for "excess in exercise of the arbitrators' powers" and have upheld the arbitrators' finding of no "just cause" for dismissal, even though the arbitrators found that the charged misconduct had occurred. *See, e.g., FOP Lodge No. 5 (Young),* 125 Pa.Commonwealth Ct. at 630, 558 A.2d at 164–65 (arbitrator did not exceed his authority in finding no "just cause", although grievant had committed the charged assaultive behavior); *FOP Lodge No. 5 (Wilson),* 129 Pa.Commonwealth Ct. at 399–401, 565 A.2d at 1235–37 (arbitrator did not exceed his authority in ruling that although grievants had committed the charged unbecoming conduct in failing to cooperate with an internal investigation, such conduct did not provide "just cause" for dismissal).

Under that standard, where an arbitrator finds the charged misconduct to have occurred but determines such misconduct did not constitute "just cause" for dismissal or discipline and substitutes a lesser penalty or no discipline, such a "definition or standard of 'just cause' amounts to, at most, *a mere error of*

law." *FOP Lodge No. 5 (Young)*, 125 Pa.Commonwealth Ct. at 630, 558 A.2d at 165. Such action, "while perhaps an error of law, and therefore, subject to judicial review and reversal under the UAA, is beyond this court's power to correct because of our limited scope of review where the standard is narrow certiorari." *FOP Lodge No. 5 (Wilson)*, 129 Pa.Commonwealth Ct. at 398, 565 A.2d at 1236. A determination that no penalty is justified, even if such conduct was criminal or a breach of fiduciary, is *not* an act in excess of the arbitrator's authority which would warrant reversal under the narrow certiorari standard. *Id.* at 401, 565 A.2d at 1237. Under a narrow certiorari standard of review, it is unlikely that the Supreme Court would have reversed the arbitrator's decision in *Pennsylvania Liquor Control Board, Philadelphia Housing Authority* or *County of Centre*. *Cf. Manheim Central*, 132 Pa.Commonwealth Ct. at 103, 572 A.2d at 36 ("it is not unusual for a result to be upheld in an Act 111 case that would not be permitted under Act 195.")

## II.

To determine what standard is appropriate, we must first examine whether Act 111 is applicable to the grievance arbitration procedure. Prior to the enactment of Act 111, labor disputes between police, firefighters and other public employees were settled under an arbitration procedure provided for in the Act of June 30, 1947, P.L. 1183, *as amended*, 43 P.S. § 215.1. However, in *Erie Firefighters Local No. 239 v. Gardner*, 406 Pa. 395, 178 A.2d 691 (1962), our Supreme Court held that if this Act required a municipality to be bound by the findings of an arbitration panel, such a requirement would be unconstitutional because it would attempt to delegate a non-delegatable function under Article III, Section 20 of the Pennsylvania Constitution. *See also Harney v. Russo*, 435 Pa. 183, 255 A.2d 560 (1969).

At the time of the decision in *Erie Firefighters*, Section 20, which was subsequently renumbered as Section 31, provided that "[t]he General Assembly shall not delegate to any special commission, private corporation or association, any power to

make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever." Pa.Const. Art. III, former § 20.

In a response to the *Erie Firefighters* case, an amendment to Article III, Section 31 was presented to and passed by the electorate. *Harney.* As a result, a second sentence was added, providing in relevant part that:

Notwithstanding the foregoing limitation, or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the *adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties* ...

Pa. Const. Art. III, § 31. (Emphasis added).

While the amendment to Article III, Section 31, gave the General Assembly broad powers to implement an overall scheme of collective bargaining such as that contained in Act 195, it chose not to do so. In enacting Act 111, the General Assembly chose only to establish a procedure by which a contract was negotiated and, absent agreement, disputed terms were resolved. *Township of Moon v. Police Officers of Township of Moon,* 508 Pa. 495, 498 A.2d 1305 (1985). Act 111 gives police and fire personnel employed by the Commonwealth or its political subdivisions the right to bargain collectively over "terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions, and other benefits ..." It provides "interest arbitration" where an impasse was reached between the parties through the creation of a three-member arbitration board. Sections 1 through 8 of Act 111, 43 P.S. § 217.1–217.8; *see Appeal of Upper Providence Township,* 514 Pa. 501, 526 A.2d 315 (1987). The limited nature of Act 111 is not surprising, considering its historical background, as well as that at the time of its passage, collective bargaining by other public employees was not permitted.

In regard to the reviewability of an interest arbitration panel's decision, Section 7 of Act 111, 43 P.S. § 217.7, provides in relevant part:

> The determination of the majority of the board of arbitration thus established shall be final on the issue or issues in dispute and shall be binding upon the public employer and the policemen or firemen involved. Such determination shall be in writing and a copy thereof shall be forwarded to both parties to the dispute. *No appeal therefrom shall be allowed to any court.* Such determination shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth with respect to matters which require legislative action, to take the action necessary to carry out the determination of the board of arbitration. (Emphasis added).

Even though Section 7 specifically states that "[n]o appeal ... shall be allowed to any court" and, therefore, does not provide a standard of review, in *Washington Arbitration Case, supra,* our Supreme Court determined that appeals from an arbitration panel's decision could be taken pursuant to Rule 68½ of the Supreme Court Rules. That rule sets forth what is commonly known as the "certiorari" standard of review. The Supreme Court, in *Washington,* stated:

> We have decided to grant the city's petition under Rule 68½. The parameters of the review permissible under that rule are as follows:
>
>> "If an appeal is prohibited by an Act, or the decision of the Agency is stated to be final or conclusive, the law is well settled that an appeal will lie to the Courts in the nature of a narrow certiorari and this Court will review only (1) the question of jurisdiction; (2) the regularity of the proceedings before the Agency; (3) questions of excess in exercise of powers; and (4) constitutional questions: Cf. Devito v. Civil Service Commission, 404 Pa. 354,

172 A.2d 161 [ (1961) ] (and cases cited therein); Dauphin Deposit Trust Company v. Myers, 401 Pa. 230, 164 A.2d 86 [ (1960) ]."

436 Pa. at 173–74, 259 A.2d at 440–41.[10]

Because of the origin of Act 111, the courts of this Commonwealth specifically held that it would be illegal to include such a grievance arbitration provision in an Act 111 police or fire collective bargaining agreement. In *Allegheny Firefighters, Local 1038 v. Allegheny County*, 7 Pa.Commonwealth Ct. 81, 88–89, 299 A.2d 60, 63 (1973), we expressly held that Act 111 gave an arbitration panel no jurisdiction to order grievance arbitration for disputes arising out of a police or fire collective bargaining agreement when we stated:

Mindful of the admonition of the Supreme Court in Washington, supra, that legitimate issues in the context of a private sector labor dispute may not be legitimate in the context of a public sector labor dispute because public employees are in many respects more limited in what they may do vis-a-vis their employees, the lower court in this case concluded *that the Act cannot be construed to include a grievance procedure for settlement of currently unidentifiable disputes as a proper subject for collective bargaining 'concerning terms and conditions of employment.' The grievance procedure in the arbitration award in question was thus held to be beyond the authority of the arbitrators to make.* In reaching this conclusion, the lower court relied in part upon a comparison of provisions of Act No. 111 and the more recently enacted Public Employe Relations Act of July 21, 1970, P.L. 563, 43 P.S. § 1101.101, which specifically includes union security and a grievance procedure as proper subjects of collective bargaining, thus indicating a contrary legislative intent with respect to Act No. 111.

*We agree with the conclusion reached by the lower court.* We would add that assuming some form of grievance proce-

---

10. Rule 68½, which the Supreme Court used to establish the narrow certiorari rule for interest arbitration, no longer exists. Rule 68½ was repealed on or about July 1, 1972. No comparable rule presently exists in the Pennsylvania Appellate Rules.

dure might properly be the subject of collective bargaining under Act No. 111, a grievance procedure such as the one here in question which provides for ultimate binding arbitration of disputes unresolved by prior steps in the procedure is a *clear second delegation of authority to a non-governmental body by the first non-governmental authority (the original arbitration panel) whose authority to perform a governmental act is recognized as an exception to nondelegation by the limited provisions of Article III, Section 31, of our present Constitution. Such a second delegation poses a serious constitutional issue,* which has not been raised and which we do not now decide. (Emphasis added).

*See Township of Moon,* 508 Pa. 495, 498 A.2d 1305 (1985); *Cheltenham Township v. Cheltenham Police Department,* 8 Pa.Commonwealth Ct. 360, 301 A.2d 430 (1973).[11] *See also* John D. Thrush, *A Survey of Public Sector Collective Bargaining in Pennsylvania,* 83 Dick.L.Rev. 755, 772, n. 137 (1979).

At this point in the analysis, it is apparent that:

● Act 111 does not contain any language authorizing grievance arbitration;

● for an Act 111 interest arbitration panel without jurisdiction to include such a provision in a police or fire collective bargaining agreement was illegal;

● the narrow certiorari standard was created by the Supreme Court to review interest arbitration awards only.

### III.

Because Act 111 does not provide for grievance arbitration, grievance arbitration provisions were not negotiated nor awarded by arbitrators for inclusion in collective bargaining agreements. That changed with the passage of the UAA by the General Assembly and our Supreme Court's decision in *Township of Moon,* 508 Pa. 495, 498 A.2d 1305 (1985).

11. "Grievance procedure" is not a proper matter for collective bargaining under Act 111. *Cheltenham,* 8 Pa.Commonwealth Ct. at 364, 301 A.2d at 433.

In 1980, the General Assembly enacted the UAA which established uniform arbitration procedures regarding "collective bargaining agreement[s] to arbitrate controversies between employers and employees; and those arising out of government contracts." In *Township of Moon,* our Supreme Court was dealing with a dispute involving the propriety of an interest arbitration panel's inclusion in its award of a procedure for binding grievance arbitration. Reviewing the *interest arbitration* award under the narrow certiorari standard set forth in *Washington,* it held that Act 111 did not foreclose an arbitration panel's power to establish procedures for the *grievance arbitration.* It found that such a procedure could be legally imposed, not under Act 111, but under the provisions of the UAA. It did so because if "the parties could have voluntarily agreed to a grievance procedure in accordance with the Uniform Arbitration Act",[12] then it certainly followed that an arbitration panel also had the authority.[13] *Id.* at 509, 498 A.2d at 1312. In *Township of Moon,* our Supreme Court again reiterated that Section 4 of Act 111, 43 P.S. § 217.4, which sets forth procedures for interest arbitration, relates only to a "contract negotiation impasse and not to an alleged grievance." *Id.*[14]

12. 42 Pa.C.S. § 7302(b) provides:
    This subchapter shall apply to a collective bargaining agreement to arbitrate controversies between employers and employees or their respective representatives only where the arbitration pursuant to this subchapter is consistent with any statute regulating labor and management relations.

13. Until the enactment of the Uniform Arbitration Act in 1980, a governmental body was without authority to enter into a grievance arbitration procedure; once it had the power to do so, so does an arbitration panel. *See Chirico v. Board of Supervisors of Newton Township,* 504 Pa. 71, 470 A.2d 470 (1983).

14. When our Supreme Court found that the UAA authorizes grievance arbitration, it was in accord with its goal to provide a fuller relationship to police and fire collective bargaining by bringing it into the mainstream of labor relations law. In *Philadelphia Fire Officers Association v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 369 A.2d 259 (1977), our Supreme Court held that Act 111 should be read *in pari materia* with the Pennsylvania Labor Relations Act (PLRA), Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. §§ 211.1–211.13, for the purpose of providing a procedure for conducting representation elec-

Our Supreme Court held that the UAA was the source by which an arbitration panel could order a grievance arbitration procedure. Again, in *Appeal of Upper Providence Township,* our Supreme Court, while reaffirming the narrow certiorari standard of review from interest arbitration disputes arising under Act 111 as enunciated in *Washington,* alluded in footnote 3 to *Township of Moon* and stated that:

> While we did not specifically address the issue of whether the UAA superseded or modified the scope of review under Act 111, this court has recently had the occasion to consider the two statutes. In Township of Moon, this court reviewed an arbitration award that established *a binding grievance arbitration procedure in conformity with the [UAA], and we held that the arbitrators could legitimately establish such a procedure.* The majority reasoned that although Act 111 did not establish a binding grievance arbitration mechanism (as opposed to "interest" impasse arbitration), neither did it expressly preclude adoption of such mechanism, and thus, the grievance arbitration procedure awarded by the arbitrators was within their authority and was affirmed. *The arbitration mechanism provided in the [UAA] was not inconsistent, for grievance arbitration purposes, with Act 111.* The standard of review applied in Township of Moon on the issue of whether the arbitrator's award was within their powers and authority, however, was not that contained in the [UAA] but was, rather, the now-traditional Act 111 standard of review adopted in City of Washington.

*Appeal of Upper Providence Township,* 514 Pa. at 512, n. 3., 526 A.2d at 320, n. 3. (Citation omitted) (Emphasis added).

tions for firefighters. The Supreme Court held that Section 1932 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1932, required that the two statutes be read together, because while representative elections were proper under Act 111, specific procedures governing such procedures were lacking. *Id.* at 555, 369 A.2d at 261; *see also Borough of Nazareth v. Pennsylvania Labor Relations Board,* 534 Pa. 11, 626 A.2d 493 (1993). The Supreme Court instructed the parties to refer to the PLRA for such procedures because they are consistent with the intent of Act 111. *See also* Kurt H. Decker, *The PLRB's New Jurisdiction for Police and Firemen,* 16 Duq.L.Rev. 185 (1977–78).

Because case law specifically holds that the UAA is the source of the authorization for the inclusion of grievance arbitration in police and fire collective bargaining agreements, the standard of review that should be used in reviewing grievance arbitration awards is the one specifically set forth in 42 Pa.C.S. § 7302(d) commonly known as the "essence test." It provides:

(1) Paragraph (2) shall be applicable where:

(i) The Commonwealth government submits a controversy to arbitration;

(ii) A political subdivision submits a controversy with an employee or a representative of employees to arbitration;

(iii) Any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to this subchapter.

(2) Where this paragraph is applicable, a court, in reviewing an arbitration award pursuant to this subchapter, shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury, the court would have entered a different judgment or a judgment notwithstanding the verdict.

In the present case, the Agreement between the State Police, a Commonwealth agency, and the Union provides for grievance arbitration. Consequently, the Agreement should fall within the scope of the UAA as provided by Section 7302(d). If the Agreement is covered under the UAA's statutory arbitration procedures, Section 7302(d) then applies. This section provides that where a "person has been required by law to submit ... a controversy to arbitration pursuant to this subchapter; ... a court in reviewing ... [the] ... award ... shall modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury, the court would have entered a different judgment or a judgment notwithstanding the verdict." 42 Pa.C.S. § 7302(d)(1) and (2). As stated by the Supreme Court in

*County of Centre v. Musser,* 519 Pa. 380, 548 A.2d 1194 (1988), this scope of review is akin to the "essence test."

After examining the provisions of Act 111, the UAA, the case law, and the negotiated collective bargaining agreement, we hold that the source of the authorization for police and fire grievance arbitration is the Uniform Arbitration Act, and, accordingly, the standard for review is the one provided for in 42 Pa.C.S. § 7302(d), the essence test.

## *IV.*

Now that we have determined the proper scope of review, we must now determine whether the arbitrator's award drew its essence from the agreement.

■ The State Police contend that the arbitrator's award does not draw its essence from the agreement because the arbitrator found that Trooper Betancourt committed the alleged conduct, but that it did not amount to Unbecoming Conduct as defined by the Field Regulations. The State Police argue that the arbitrator, in this instance, is bound by the Commissioner's interpretation of Unbecoming Conduct.

In his award, the arbitrator found that Trooper Betancourt did, in fact, expose himself in the office. Using testimony from another trooper at the scene, the arbitrator described what happened as follows:

> On that particular afternoon I observed Trooper Betancourt engaged in conversation with Trooper [Francine] Taggart in the office ............ They were engaged in dialogue at which time Trooper Betancourt reveals himself ............ He revealed himself, exposed his penis ........................
> ....................................................
> He was engaged in conversation with Trooper Taggart at which time he told her to sit on his penis and peddle his testicles using colloquy term [sic] ......................................
> ....................................................
> At which time she replied. I didn't hear her reply, at which time he exposed himself. (Spacings in original).

Despite finding that Trooper Betancourt exposed his penis, the arbitrator set aside the 30–day suspension imposed by the State Police, awarded all lost wages and benefits, including

overtime and night-shift differential payments, and ordered that the incident should be stricken from his record.

The arbitrator arrived at this decision by finding that any reasonable person would conclude that such conduct does not squarely fit within the definition of Unbecoming Conduct since there was no public exposure of his "misadventures" and most but not all of his fellow officers condoned the behavior. The arbitrator's finding that the conduct of Trooper Betancourt was not unbecoming fails to draw its essence from the agreement.

Trooper Betancourt was charged with Unbecoming Conduct as defined by Field Regulation 1.01 which provides that:

A member shall not conduct himself/herself in a manner which is unbecoming to a police officer. Unbecoming conduct is that type of conduct which *could reasonably be expected to destroy public respect* for state police officers *and/or confidence* in the Pennsylvania State Police. (Emphasis added).

A charge of Unbecoming Conduct under Field Regulation 1–1.01 is clearly an offense which is subject to discipline and possible suspension. *See Soja v. Pennsylvania State Police,* 500 Pa. 188, 455 A.2d 613 (1982); *McFadden v. Pennsylvania State Police,* 115 Pa.Commonwealth Ct. 635, 540 A.2d 1009 (1988), *petition for allowance of appeal denied,* 522 Pa. 580, 559 A.2d 40 (1989).

Unbecoming Conduct has consistently been defined as any conduct *"tending* to destroy public respect" and confidence in the operation of services or affecting the morale or efficiency of the police department. *Zeber Appeal,* 398 Pa. 35, 43, 156 A.2d 821, 825 (1959) (emphasis added); *See also Civil Service Commission of City of Philadelphia v. Wojtusik,* 106 Pa.Commonwealth Ct. 214, 525 A.2d 1255 (1987); *Wallace Appeal,* 90 Pa.Commonwealth Ct. 539, 496 A.2d 102 (1985).

Once finding that the conduct took place, the arbitrator's finding that Trooper Betancourt's conduct in exposing himself did not constitute Unbecoming Conduct does not draw its essence from the agreement. Not only would the conduct of

Trooper Betancourt cause affront to the general public, it may also be the subject to the criminal charge of Indecent Exposure.[15] As such, the conduct is clearly within the definition of Unbecoming Conduct.

Accordingly, we reverse the arbitrator's award and reinstate the 30–day suspension [16] imposed by the Commissioner.

## ORDER

AND NOW, this 8th day of November, 1993, the arbitrator's award dated April 1, 1991, is reversed and the 30–day suspension issued by the Commissioner is reinstated.

DOYLE, Judge, dissenting.

I respectfully dissent from the majority opinion principally because I disagree with the Court's new resolve to change the judicial standard of review in police arbitration awards under Act 111 [1] and apply the much broader standard of review, judgment non obstante veredicto,[2] which will not only erase extensive past precedent of this Court,[3] which it may do, but

15. 18 Pa.C.S. § 3127.

16. Section 5 of Article XXXVIII of the collective bargaining agreement requires the arbitrator to confirm his or her award to the precise issue prescribed which, in this case, was "Did the State Police have *just cause to discipline* the grievant for his asserted violation of Field Regulation 1.01 Unbecoming 'Conduct; if not, *what shall the remedy be?"* (Emphasis added). The penalty was to be considered by the arbitrator only if he found that Trooper Betancourt did not commit Unbecoming Conduct. *See Manheim,* 132 Pa.Commonwealth Ct. at 104, 572 A.2d at 36. Because we have found that the arbitrator should have found that Trooper Betancourt was guilty of Unbecoming Conduct, the arbitrator is required to impose the 30–day suspension.

1. Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1–217.10 (Act 111).

2. In its broadest sense, judgment n.o.v. means a judgment rendered in favor of one party notwithstanding the finding of a verdict in favor of the other party. 49 C.J.S. Judgments § 59 (1947). If the law does not permit recovery upon the alleged facts on which the jury may justifiably have found, a judgment n.o.v. should be granted. *Burton v. Terry,* 140 Pa.Commonwealth Ct. 336, 592 A.2d 1380 (1991).

3. *See City of Philadelphia v. Fraternal Order of Police, Lodge No. 5,* 140 Pa.Commonwealth Ct. 235, 592 A.2d 779 (1991) (*Boykins* ), *petition for allowance of appeal denied,* 529 Pa. 626, 600 A.2d 541 (1991); *City of*

which will also attempt to "reverse" a decision of the Pennsylvania Supreme Court, which this Court may not do.[4] I further disagree with several other conclusions reached by the majority, which will be addressed seriatim.

For a better understanding of what is involved in this appeal, I believe a reference first to the arbitrator's award would be of significant help.

At the outset the arbitrator acknowledged that this case "allowed two plausible theories regarding the events at issue." He specifically adopted one over the other and found as follows:

[T]hat the generally permissive decorum and esprit de corps in the Warrants/O.R. Unit allowed the grievant, sometimes referred to as 'Benny', and others, to play with the 'Jolly Pecker'; that on February 24th, believing his behavior was not unacceptable, Benny did expose himself, and that, as the Department says, his peers were not, except for Trooper Watson, 'affronted or alarmed'.

The arbitrator then concluded:

What remains, then, is the consideration of whether the grievant's behavior, under all the circumstances, constitutes a violation of F.R. 1–1, Section 1.01—Unbecoming Conduct, and the appropriateness of the penalty imposed.

1.01 UNBECOMING CONDUCT

*Philadelphia v. Fraternal Order of Police Lodge No. 5*, 125 Pa.Commonwealth Ct. 625, 558 A.2d 163 (1989) (*Young*); *City of Philadelphia v. Fraternal Order of Police Lodge No. 5*, 129 Pa.Commonwealth Ct. 392, 565 A.2d 1232 (1989) (*Wilson*); *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 120 Pa.Commonwealth Ct. 610, 549 A.2d 1014 (1988) (*Christy*); *City of Carbondale v. Fraternal Order of Police Lodge 63*, 109 Pa.Commonwealth Ct. 325, 531 A.2d 76 (1987) (*Barbaro*); *Allegheny County Police Ass'n v. County of Allegheny*, 100 Pa.Commonwealth Ct. 327, 514 A.2d 964 (1986), *appeal dismissed*, 516 Pa. 17, 531 A.2d 1108 (1987).

4. *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 526 Pa. 301, 586 A.2d 355 (1991) (*Bojanowski*), *affirming per curiam* the opinion of this court which held that the scope of review of an arbitrator's award under Act 111 (disciplinary grievance) was narrow certiorari, *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 137 Pa.Commonwealth Ct. 1, 586 A.2d 459 (1989) (*Bojanowski*).

A member shall not conduct himself/herself in a manner which is unbecoming to a police officer. Unbecoming conduct is that type of conduct which could reasonably be expected to destroy *public* respect for State Police officers and/or confidence in the Pennsylvania State Police. (Emphasis added).

Clearly, the major thrust of the cited regulation is maintaining the public's respect and confidence in the State Police. The grievant's behavior, if public knowledge, certainly would under-cut [sic] that goal. However, there was absolutely no public exposure of his misadventures, and the Department grudgingly recognizes that his fellow officers, except for Trooper Watson, tacitly condoned his behavior. *Any reasonable person would be forced to conclude that the grievant's behavior does not squarely fit the conduct that R.R. 1.101 defines as 'Unbecoming.'* (Emphasis added.)

This recitation from the arbitrator's award contains all of the essential facts, his conclusion, and his reasoning to sustain the grievance. And, it is this judgment that the majority of the Court would reverse, on grounds that the arbitrator's findings were unreasonable, by concluding: "once finding that the conduct took place, the arbitrator's findings that Trooper Betancourt's conduct in exposing himself did not constitute Unbecoming Conduct does not draw its essence from the agreement" (majority p. 506).

I would hold that under *any* standard of judicial review, the arbitrator's award should be affirmed and, quite frankly, cannot think of anything more germane to the essence of the collective bargaining agreement here under consideration than an arbitrator's interpretation of whether specified conduct is or is not "unbecoming conduct" as set out in the field regulations of the State Police. Why provide for arbitration at all if all that is at issue is whether or not the activity—*any* activity upon which charges are brought—took place? It is settled law that a judgment n.o.v. should be entered only in the clearest of cases, and where no two reasonable people could fail to agree that the verdict is improper, resolving any doubts in favor of the verdict winner. *Atkins v. Urban Redevelop-*

*ment Authority of Pittsburgh,* 489 Pa. 344, 414 A.2d 100 (1980); *Buck v. Scott Township,* 325 Pa.Superior Ct. 148, 472 A.2d 691 (1984). That is certainly not the case here.

I would have to agree with the majority's statement, however, that the result in any given case can differ depending upon whether an arbitration award is reviewed under the judgment n.o.v. standard on the one hand, or the narrow certiorari standard of review on the other (*see* majority p. 1282); which is the predominant issue in this appeal and was raised by the parties in an unusual manner.

### Standard of Review

The appellant, the Pennsylvania State Police (PSP), in its "Statement of Questions" on page 3 of its brief, listed three issues [5] as follows (the emphasis is ours):

1. "Did the Arbitrator commit *an excess in the exercise of his powers,*" by holding that the trooper's conduct in exposing himself did not constitute unbecoming conduct,

2. "Did the Arbitrator commit *an excess in the exercise of his powers* " by awarding the trooper the benefits he was denied while he was on restricted duty, and

3. "Did the Arbitrator commit *an excess in the exercise of his powers* " by ordering PSP to strike from the trooper's personnel record any reference to the incident despite the fact that the Arbitrator found that the trooper had exposed himself.

Such a statement of the issues would be correct only if the standard of judicial review over the Arbitrator's decision was the "strict" or "narrow certiorari" scope of review under Act

5. In addition, although not specifically set out as a separate issue, PSP argues that the arbitration was in the nature of an appellate review of the Commissioner's determination in the court-martial proceeding and that the Commissioner's decision should be upheld unless he exceeded his authority.

This argument completely misperceives the nature of the arbitration proceeding and the agreement to arbitrate contained in the Collective Bargaining Agreement. Such arbitration was in lieu of court-martial proceedings and this Court will review the arbitration award as if the court-martial proceedings had never taken place.

111 which governs collective bargaining between police and fire personnel and their public employers. Quite appropriately, PSP argues in the body of its brief that narrow certiorari *is* the appropriate standard, citing as authority, *Appeal of Upper Providence Police Delaware County Lodge # 27 FOP*, 514 Pa. 501, 526 A.2d 315 (1987), and this Court's recent pronouncement of that standard in *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 137 Pa.Commonwealth Ct. 1, 586 A.2d 459 (1989) *(Bojanowski )*,[6] *aff'd per curiam*, 526 Pa. 301, 586 A.2d 355 (1991), to wit:

> [O]ur scope of review of an arbitrator's award rendered pursuant to an arbitration proceeding under [Act 111] is limited to questions involving: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) *questions of excess in exercise of powers;* and (4) constitutional questions.

*Id.* 137 Pa.Commonwealth Ct. at 5, 586 A.2d at 461 (emphasis added).

While both *Appeal of Upper Providence Police* and *Bojanowski* dealt with Act 111 arbitration awards, the former concerned an interest arbitration award, while the latter concerned an appeal from a grievance arbitration involving the discipline of a police officer, as is the case here.

Inexplicably, the Appellee/Association in its brief, while first acknowledging that the argument of PSP on the merits is based entirely upon the narrow certiorari standard of review, argues, to the contrary however, that such a standard is misplaced because the issue on appeal "relates to a contractual grievance arbitration." Rather than narrow certiorari, the Association argues, under the provisions of Section 7302(a) of the Uniform Arbitration Act (UAA), 42 Pa.C.S. §§ 7302(a), this Court should consider the appeal as one from the award of an arbitrator under common law arbitration, which stan-

---

6. Originally, the opinion of this Court was unpublished. However, following the Supreme Court's disposition of the case on January 7, 1991, publication of this Court's opinion was ordered on January 22, 1991.

dard of review has *never* been employed in an appeal of an arbitration award—any arbitration award—under Act 111.

Judicial review of a common law arbitration award is, of course, extremely narrow, even more strict than review under narrow certiorari. An award from a common law arbitration "may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award." Section 7341 of the Judicial Code, 42 Pa.C.S. § 7341. Under common law arbitration, the arbitrator is the final judge of both the facts *and the law* and the award is not subject to judicial review for mistakes of either. *Pennsylvania Social Services Union v. Department of Labor and Industry, Bureau of Workers' Compensation*, 105 Pa.Commonwealth Ct. 264, 524 A.2d 1005 (1987); *Young v. U.S.F. & G.*, 299 Pa.Superior Ct. 237, 445 A.2d 542 (1982), *appeal dismissed per curiam*, 500 Pa. 233, 455 A.2d 635 (1983).

PSP, in its reply brief to the Association, then changed its position and now agrees with the Association that grievance arbitration under Act 111 is not the strict standard of narrow certiorari, but further contends that principles of common law arbitration are likewise inapplicable. PSP, not inexplicably, having lost before the arbitrator, now wishes to vest this Court with as much discretionary review as possible to change the result, and argues in furtherance of that end that because Act 111 does not directly address the subject of grievance arbitration, such awards in *grievance* arbitration, as distinguished from *interest* arbitration, should come under the purview of Section 7302(d) of the UAA, providing the much broader judicial review which allows us to set aside or modify the award if "the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict" 42 Pa.C.S. § 7302(d)(2). Further, as has already been pointed out, our Supreme Court in *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977),

has equated the judgment n.o.v. standard of review with the "essence test" formulated by the United States Supreme Court in the Steelworkers trilogy[7] which dealt with arbitration awards under the federal Taft–Hartley Act[8] regulating labor/management relations in the private sector. The "essence test" was made applicable in Pennsylvania to public sector arbitration awards under Act 195/PERA[9] in *Brownsville Area School District v. Brownsville Education Association*, 26 Pa.Commonwealth Ct. 241, 244, 363 A.2d 860, 861 (1976); *see also Community College of Beaver County; Leechburg Area School District v. Dale*, 492 Pa. 515, 519, 424 A.2d 1309, 1312 (1981).

Succinctly stated, under the judgment n.o.v. standard, the arbitrator's interpretation of a PERA collective bargaining agreement will not be disturbed if it is "reasonable." *Community College of Beaver County.*

I would decline to accept either the Association's argument for the adoption of judicial review applied in common law arbitration or the broadened scope of review, applying the judgment n.o.v. standard, urged upon us by PSP.

### The Association's Argument—Common Law Arbitration

By an overview, the statutory scheme of Chapter 73 of the Judicial Code dealing with all types of arbitration should be kept in mind. Chapter 73 contains three subchapters: Subchapter A—Statutory Arbitration; Subchapter B—Common Law Arbitration (which consists of only one section, 42 Pa.C.S. § 7341); and Subchapter C—Judicial Arbitration (civil matters before the courts of common pleas where claims below a

**7.** Three decisions of the Supreme Court of the United States handed down on the same day in 1960, *viz.*, *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**8.** 29 U.S.C. §§ 141–188.

**9.** Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301.

certain stated amount are first submitted to an arbitration board consisting of three members of the bar).[10] Prior to codification of Title 42 of the Consolidated Statutes (basically known as the Judicial Code[11] or "Code"), the scope of judicial review in common law arbitration was established by case law and remained so even after Pennsylvania adopted the original version of the Uniform Arbitration Act of 1927.[12]

But with the adoption of the Judicial Code by the Judiciary Act of 1976,[13] statutory recognition was given to common law arbitration in Section 7341 of the Judicial Code, which provides:

### § 7341.   Common law arbitration

The award of an arbitrator in a nonjudicial arbitration which is not subject to Subchapter A (relating to statutory arbitration) or a similar statute regulating nonjudicial arbitration proceedings is binding and may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award.

With this recognition in statutory law, the General Assembly then attempted to correlate both the provisions of common law arbitration and the UAA in Section 7302 of the Code when

10.   Subchapter C—Judicial Arbitration does not concern us here.

11.   *See* 42 Pa.C.S. § 101.

12.   The majority opinion in several instances states that the UAA was adopted in Pennsylvania in 1980 (*see* majority slip op. pp. 7, 18). This is manifest error. The original version of the UAA was adopted in Pennsylvania by the Act of April 25, 1927, P.L. 381, 5 P.S. §§ 161–181 (The Arbitration Act of 1927), repealed by the Act of October 5, 1980, P.L. 693 (Sections 1–19).

The national Conference of Commissioners on Uniform State Laws recommended the adoption of a uniform arbitration act in the early 1920's but only six states, including Pennsylvania, adopted it. Pennsylvania repealed The Arbitration Act of 1927 only when it adopted the new version of the UAA in 1980. See Section 501(c) of the Act of October 5, 1980, P.L. 693.

13.   The Act of July 9, 1976, P.L. 586, 42 Pa.C.S. §§ 101–4327. The effective date of the Judiciary Act of 1976 generally was 60 days from the date of final enactment of the Act of April 28, 1978, P.L. 202 (JARA), or June 27, 1978.

it adopted in 1980 the present adaptation of the UAA. The two were, however, clearly distinct, and remain so; the adoption of the new version of the UAA in 1980 did not abrogate the scope of judicial review over common law arbitration awards. *Joint Board of Waist and Dressmakers' Union of Philadelphia v. Rosinsky,* 173 Pa.Superior Ct. 303, 98 A.2d 447 (1953); *see also* Herbert L. Sherman Jr., *Analysis of Pennsylvania's Arbitration Act of 1980,* 43 U.Pitt L.Rev. 363 (1982).

The Association's argument that this arbitration is common law arbitration rests upon its interpretation of Section 7302(a) and *Derry Township Municipal Authority v. Solomon and Davis, Inc.,* 372 Pa.Superior Ct. 213, 539 A.2d 405 (1988). Both arguments are misplaced. First, it argues that since the Collective Bargaining Agreement did not expressly provide that the arbitration proceedings were to be conducted pursuant to the UAA, then common law arbitration rules apply.

The argument of the Association is flawed, however, because it fails to take into account all of the provisions of the UAA, the pertinent parts of which are as follows:

### § 7302. Scope of Subchapter

(a) **General rule.**—An agreement to arbitrate a controversy on a nonjudicial basis shall be conclusively presumed to be an agreement to arbitrate pursuant to Subchapter B (relating to common law arbitration) unless the agreement to arbitrate is in writing and expressly provides for arbitration pursuant to this subchapter or any other similar statute, in which case the arbitration shall be governed by this subchapter.

(b) **Collective bargaining agreements.**—This subchapter [meaning the UAA] shall apply to a collective bargaining agreement to arbitrate controversies between employers and employees or their respective representatives *only where the arbitration pursuant to this subchapter is consistent with any statute regulating labor and management relations.*

**(c) Government contracts.**—This subchapter shall apply to any written contract to which a government unit of this Commonwealth is a party to the same extent as if the government unit were a private person, except that where a contract to which the Commonwealth government is a party provides for arbitration of controversies but does not provide for arbitration pursuant to any specified statutory provision, the arbitration shall be governed by this subchapter.

**(d) Special Application.—**

(1) Paragraph (2) shall be applicable where:

(i) The Commonwealth government submits a controversy to arbitration.

(ii) A political subdivision submits a controversy with an employee or a representative of employees to arbitration.

(iii) Any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to this subchapter.

(2) Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.

By reference to Section 1933 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1933,[14] the specific Section 7302(*b*), relating to collective bargaining agreements, both private and public sector, must prevail over the general provisions of

---

14. Section 1933 of the Statutory Construction Act of 1972 provides:

Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted late and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

Section 7302(*a*). This means in this case therefore, that once the provisions of the court-martial proceedings under the Administrative Code were no longer applicable, the entire agreement between the parties was governed by the provisions of Act 111. The parties were not required to expressly "provide" for Act 111 arbitration; Act 111 was expressly "provided" for them by an act of the General Assembly. Act 111 was not just presumably applicable, it was expressly applicable by legislative fiat. Therefore, the general provisions of Section 7302(a) are inapplicable to this appeal.

The Association's reliance upon *Derry Township* is similarly misplaced because at issue in that case was a government contract between the Derry Township Municipal Authority and a private contractor for the construction of various portions of a sanitary sewer system.[15] In that contract, the arbitration clause provided that any dispute would be submitted to the American Arbitration Association. The *Derry* Court held that because the arbitration provision in the contract did not expressly provide for statutory arbitration, the agreement did not overcome the presumption in Section 7302(a) that the parties intended common law arbitration. *Id.* at 221, 222, 539 A.2d at 409, 410. Judge (now Justice) Montemuro, in an expansive opinion discussing the ramifications of Section 7302, explained why a contractual dispute involving a local unit of government would be subject to the presumptive intent of common law arbitration that would not be applicable if the contracting governmental unit was the Commonwealth itself.

### The Argument of PSP for Judgment n.o.v.

By the same close scrutiny of the provisions of Section 7302(b) of the UAA, I am led to conclude that Section 7302(d), entitled "Special Application," which provides the broad scope

15. The Association argues that the appeal "relates to a contractual grievance arbitration." While I would acknowledge that collective bargaining agreements are essentially "contracts," the terms "Government contracts" in Section 7302(c) and "Collective Bargaining Agreements" as employed in Section 7302(b) have to be read as being mutually exclusive terms.

of judicial review under the judgment n.o.v. standard, likewise does not apply to arbitration awards under Act 111.

The reason, simply put, is that arbitration awards pursuant to Act 111 are totally inconsistent with arbitration awards pursuant to the Uniform Arbitration Act as this Court, as well as the Supreme Court, has so clearly stated on numerous occasions.

The General Assembly enacted Act 111 pursuant to an amendment to Article III, Section 31 of the Pennsylvania Constitution [16] to give police and fire personnel employed by the Commonwealth and its political subdivisions the right to bargain collectively over "terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions, and other benefits...." Because police and fire personnel are denied the right to strike, Act 111 also established an arbitration mechanism for implementing the right to collective bargaining, specifically providing the procedures to be followed for interest arbitration. Section 7 of Act 111 provides:

> The determination of the majority of the board of arbitration thus established shall be final on the issue or issues in dispute and shall be binding upon the public employer and the policemen or firemen involved. Such determination shall be in writing and a copy thereof shall be forwarded to both parties to the dispute. *No appeal therefrom shall be allowed to any court.*

43 P.S. § 217.7 (emphasis added). Notwithstanding this language of the statute, our Supreme Court in *City of Washington v. Police Department of Washington,* 436 Pa. 168, 259 A.2d 437 (1969), held that the courts do have jurisdiction for a

16. Article III, Section 31 of the Pennsylvania Constitution provides in relevant part that:

> [T]he General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the *adjustment of grievances of disputes for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties....* (Emphasis added.)

A constitutional analysis of Act 111 is provided in *Harney v. Russo,* 435 Pa. 183, 255 A.2d 560 (1969).

limited review of Act 111 arbitration awards. The court stated that such a review must be in the nature of narrow certiorari, limiting the review to questions concerning the arbitrator's jurisdiction, the regularity of the proceedings, an excess in the exercise of the arbitrator's powers, and constitutional questions. *Id.* at 174, 259 A.2d at 441.

PSP argues that since grievance arbitration is not specifically mentioned in the Act, such grievance awards were not meant to come within the purview of Act 111. I reject this argument on several grounds.

**First,** Article III, Section 31 of the Pennsylvania Constitution specifically envisions a "law for the adjustment or settlement of *grievances or disputes* or for collective bargaining between policemen and firemen and their public employers [which] shall be binding upon all parties...." (Emphasis added.) Clearly then both the settlement of grievances as well as disputes over working conditions (interest arbitration) was envisioned by the same constitutional allowance.

**Second,** our Supreme Court declared in *Chirico v. Board of Supervisors for Newtown Township,* 504 Pa. 71, 470 A.2d 470 (1983), that Act 111 specifically avoids the use of the courts for any dispute resolution, as evidenced by the language providing that "no appeal therefrom shall be allowed to any court," and then concludes: "Thus, the only method for settling *grievance* disputes allowable within the framework of Act 111 is arbitration." *Id.* at 79, 470 A.2d at 475 (emphasis added). Moreover, the parties themselves, in recognition of this principle, agreed in the subject Collective Bargaining Agreement that "the decision of the arbitrator shall be final and binding on both parties" (Article 28, Section 1).

**Third,** the very first section of Act 111 establishes that police and fire personnel "shall have the right to an adjustment or settlement of their *grievances* or disputes in accordance with the terms of *this* act." 43 P.S. § 217.1 (emphasis added). To accept the argument of PSP that because no *specific* procedure was provided for the settlement of grievances, the courts should therefore adopt the standard by

which a trial court reviews a jury's verdict, would be to reject the very purpose of Act 111. This very argument was fully answered by Chief Justice Nix in *Chirico:*

> A dispute over the interpretation of a provision in an existing award falls within the ambit of grievance arbitration. See Geriot v. Council of Borough of Darby, 491 Pa. 63, 417 A.2d 1144 (1980). Grievance disputes are properly handled within the framework of section 1 of Act 111, which provides that '[Employees] shall have the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act.' Act 111 does not set forth the specific mechanism by which grievance, as compared with interest, disputes are to be arbitrated. We acknowledge it is clearly inadequate to recognize a right 'to a settlement of grievances of disputes,' while failing to provide any method for the implementation of those rights. This obvious vacuum must not be countenanced. Yet resort to the courts to meet this need would contravene the strong affirmance of the use of non-adversarial methods for the resolution of disputes between governmental employers and police and firemen embodies in section two of the Act.

*Id.* 504 Pa. at 78–79, 470 A.2d 474–75 (footnote deleted).

What Chief Justice Nix articulated in *Chirico* was that there is an inconsistency between the two, *i.e.,* judicial review under Act 111 on the one hand, and on the other, enmeshing the courts in the resolution of the dispute in their traditional role employing a judgment n.o.v. standard. Moreover, the inquiry is not simply between the two types of arbitration, grievance versus interest; the inconsistency is between the two statutes as totally distinct legislative pronouncements. A close reading of Section 7302(b) discloses that the UAA applies *"only where the arbitration pursuant to this subchapter [UAA] is consistent with any statute regulating labor and management relations,"* and the UAA *is inconsistent* with Act 111.

**Fourth,** the Supreme Court has already stated that the scope of judicial review under Act 111 *is* inconsistent with that under the UAA:

The issue presented is whether the standard of judicial review of an arbitration award under the UAA is "consistent with any statute regulating labor and management relations," *specifically, whether the UAA standard of review is consistent with Act 111. The FOP argues that this standard of review under the UAA is consistent with Act 111, and therefore applicable to Act 111 arbitration awards, because Act 111 did not explicitly set forth a standard of judicial review. We reject this argument.*

. . . .

Moreover, as Judge Doyle correctly observed in his concurring and dissenting opinion below, the respective standards of review are not the only areas where the UAA and Act 111 are inconsistent. Act 111 represents a specific legislative response to the need for collecting bargaining between policemen and firemen and their employers, and created an arbitration mechanism designed to meet that specific need. *The Legislature did not intend that the comprehensive scheme and procedures created for arbitration under Act 111 be somehow modified implicitly by the scope of review provided under Section 7302(d) of the UAA or by any of the other inconsistent provisions.*

. . . .

In the instant case, the Uniform Arbitration Act and Act 111 similarly stand together. The standard under Act 111 for reviewing arbitration awards affecting policemen and firemen and their public employers was established in 1969 by *City of Washington,* and the legislature was well aware of that standard of review when it enacted the Uniform Arbitration Act with its *inconsistent* standard of review. Since the latter act explicitly states that it is applicable only 'where the arbitration . . . is consistent with any statute regulating labor and management relations,' and since the standard of review set forth in § 7302(d) *is at odds with* that established by City of Washington and Act 111, this Court rejects the argument (accepted by the lower courts) that the Uniform Arbitration Act implicitly modified and enlarged the standard of review.

*Appeal of Upper Providence Police,* 514 Pa. 501, 509, 511, 526
A.2d 315, 319, 320 (1987) (footnote deleted) (emphasis added).

Nothing is more clear, therefore, that in *Appeal of Upper
Providence Police* our Supreme Court recognized that the
UAA/n.o.v. standard is "inconsistent" and "at odds with that
established by . . . Act 111," and the reason that they are
inconsistent is rooted in the legislative enactments themselves,
because the type of public employee encompassed within the
purview of Act 111 (policemen and fire officers) demands that
the resolution of any dispute "must be sure and swift." *Wash-
ington Arbitration Case,* 436 Pa. at 174, 259 A.2d at 440. The
Supreme Court decisions setting this precedent have never
made a distinction between interest arbitration awards and
grievance arbitration awards.

**Fifth,** overruling the past precedent of this Court, and
attempting to countermand a decision of the Supreme Court,
is in my opinion, ill advised.

This Court has on multiple occasions explicitly held that the
appropriate standard in Act 111 *grievance* arbitration cases is,
as in interest arbitration, narrow certiorari. *See, e.g., Wilson,*
129 Pa.Commonwealth Ct. at 397, 565 A.2d at 1235 (collecting
cases); *Boykins,* 140 Pa.Commonwealth Ct. 235, 592 A.2d 779
(1991); *petition for allowance of appeal denied,* 529 Pa. 626,
600 A.2d 541 (1991) (where a Philadelphia police officer was
dismissed for conduct unbecoming an officer after he was
acquitted of criminal charges filed against him for striking an
individual over the head with his fists and with the butt of his
service revolver, this Court held, per Pellegrini, J.: "Where
. . . arbitration rights arise from [Act 111] the proper standard
of review in a grievance proceeding is in the nature of a
narrow certiorari").[17]

17. Certain of our opinions, even after a discussion of the appropriate
standard of review, have lapsed into the "essence test" language in
reviewing an award in Act 111 grievance arbitration to determine
whether there has been an excess in the exercise of the arbitrator's
authority. *E.g., City of Philadelphia v. Fraternal Order of Police Lodge
No. 5,* 125 Pa.Commonwealth Ct. 625, 558 A.2d 163 (1989) (*Young* );
*FOP, Lodge No. 5 v. City of Philadelphia,* 120 Pa.Commonwealth Ct.
610, 549 A.2d 1014 (1988) (*Christy* ); *City of Philadelphia v. FOP, Lodge*

More important, the Supreme Court has recently dealt with this very issue when it granted allocatur from our decision in *Bojanowski,* a case where the court of common pleas affirmed an arbitrator's award upholding police officer Bojanowski's dismissal for firing six shots into the rear of a fleeing automobile wounding the young daughter of the driver. The FOP grieved the police officer's dismissal but an arbitrator concluded that Officer Bojanowski had violated the City's policy on the use of deadly force and, finding just cause, upheld the dismissal.

On appeal to this Court, we held in unmistakable language, that "[o]ur scope of review of an Arbitrator's award rendered pursuant to an arbitration proceeding under [Act 111] is limited to questions involving: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) questions of excess in exercise of powers; and (4) constitutional questions." *Id.* 137 Pa.Commonwealth Ct. at 5, 586 A.2d at

No. 5, 114 Pa.Commonwealth Ct. 96, 538 A.2d 131 (1988) (*Adams*); *City of Carbondale v. FOP, Lodge 63,* 109 Pa.Commonwealth Ct. 325, 531 A.2d 76 (1987) (*Barbaro*). However, the occasional lapse into "essence test" language in reviewing Act 111 grievance arbitration does not signal any enlargement of the narrow certiorari scope of review. *See, e.g., Allegheny County Police Ass'n. v. County of Allegheny,* 100 Pa.Commonwealth Ct. 327, 332 n. 4, 514 A.2d 964, 966 n. 4 (1986). *See also City of Philadelphia v. FOP, Lodge No. 5,* 138 Pa.Commonwealth Ct. 219, 587 A.2d 860 (1991) (*Pittman*); (narrow certiorari does not include "essence test" review as modified by the UAA for error of law and judgment N.O.V. review); *FOP, Lodge No. 5 v. City of Philadelphia,* 118 Pa.Commonwealth Ct. 132, 546 A.2d 137 (1988) (*Hurst*), aff'd per curiam, 523 Pa. 490, 567 A.2d 1388 (1990) (there is no "legal error" or "question of law" review in Act 111 grievance arbitration cases; such arguments will be reviewed under "excess in exercise of authority" category of narrow certiorari).

It would seem to be the better practice to curtail indiscriminate use of "essence test" language in reviewing Act 111 arbitration awards, because such blurring of standards confuses both appellate advocacy and review. To the extent that some of our decisions have suggested that the *Leechburg* "essence test" is the appropriate standard of review in Act 111 grievance arbitration awards, these cases cannot be considered authoritative in light of the explicit clarification of the appropriate standard of review in cases such as, *Wilson, Allegheny County Police Ass'n., Pittman* and *Hurst.*

*See also* the remarks of Justice Larsen commenting on the concurring and dissenting opinion of this writer, in *Appeal of Upper Providence Police,* 514 Pa. at 513 n. 4, 526 A.2d at 321 n. 4.

461; in short, the narrow certiorari standard. This language was not fortuitous, because the first issue presented in the Appellant/FOP's brief was: "Did the award of the arbitrator draw its essence from the collective bargaining agreement...." *See* FOP's brief at p. 6. Moreover, the FOP argued in its brief to this Court that the correct standard of review was the "essence test" emanating from the U.S. Supreme Court's decision in *Steelworkers* [18] and the Pennsylvania Supreme Court's opinion in *Community College of Beaver County,* the quintessential Pennsylvania opinion holding that there is no significant difference between the judgment n.o.v. standard of review and the essence test.

In *Bojanowski,* the Supreme Court affirmed this Court by a *per curiam* order. However, Justice Larsen, in his *dissent,* brings into clear and bright focus what surely had been rejected by five Justices; [19] Justice Larsen wrote:

> Subsequently, Bojanowski and the Union appealed to the Commonwealth Court. The court affirmed, relying on the narrow [certiorari] standard of review....
>
> This standard of review, however, does not apply here because the case herein does not involve an "interest" arbitration proceeding brought pursuant to Act 111, but rather involves a "grievance" arbitration.

*Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 526 Pa. 301, 301–02, 586 A.2d 355, 356 (1991). Justice Larsen then concludes, on the basis of two prior decisions of that Court [20] which concerned grievance arbitration under PERA/Act 195, that he would apply the more liberal "essence

18. *See* note 9 *supra.*

19. Justice McDermott did not participate in the decision. Justice Cappy joined the dissent of Justice Larsen, but curiously concluded that he "would not find that the arbitrator's findings are supported by substantial evidence in so far as he disregarded a vast majority of the testimonial evidence," thus applying a standard of review employed by courts reviewing adjudications of administrative agencies. *See* Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

20. *Philadelphia Housing Authority v. Union of Security Officers # 1,* 500 Pa. 213, 455 A.2d 625 (1983); *Ringgold Area School District v. Ringgold Education Ass'n., PSEA/NEA,* 489 Pa. 380, 414 A.2d 118 (1980).

test" and "reverse the decision of the Commonwealth Court and vacate the award of the arbitrator." By using a more liberal standard, Justice Larsen properly reached a different result. By rejecting the more liberal standard, the majority of the Supreme Court reached the same result that we reached, and affirmed this Court *per curiam*. The compelling logic—since only Justice Cappy joined in Justice Larsen's dissent—must be that the view of Justice Larsen was rejected by the majority of the Supreme Court. And, a per curiam order of the Pennsylvania Supreme Court affirming a decision of this Court constitutes a binding decision of precedential authority on the question presented to and accepted for review by the Supreme Court. *Commonwealth v. Gretz*, 520 Pa. 324, 325, 554 A.2d 19, 20 (1989) ("Our *per curiam* affirmance constituted a binding decision of precedential authority on the question presented to and accepted for review by this Court").

**Sixth,** this clear precedent has not been distorted by *Township of Moon v. Police Offices of the Township of Moon*, 508 Pa. 495, 498 A.2d 1305 (1985), as the majority would have this Court now hold. In *Township of Moon*, our Supreme Court held that it was properly within the authority of an interest arbitration panel to include in its award a mechanism for grievance arbitration under the UAA. In that case, the police officers and the Township had reached impasse and the parties proceeded to arbitration pursuant to Act 111 to resolve the disputed contractual issues. The arbitration panel issued an award which provided, *inter alia*, a grievance procedure culminating in binding arbitration *but specifically provided it would be under the Uniform Arbitration Act* as follows:

> If the parties are unable to settle the grievance within twenty (20) calendar days from submission, the issue may be submitted to arbitration in accordance with the rules and regulations, then prevailing, of the American Arbitration Association except as may be limited or expanded by *the Uniform Arbitration Act of the Commonwealth.*

> Any arbitration award hereunder shall, to the extent permitted by law, be final, binding, and not subject to

review *except as provided for in the said Uniform Arbitration Act.*

*Id.* at 499 n. 2, 498 A.2d at 1307 n. 2 (emphasis added).

The only thing our Supreme Court held in *Township of Moon* was that the arbitration panel had the power to establish such a grievance arbitration procedure since it "is undisputably a legitimate term and condition of employment which is the proper subject of collective bargaining." *Id.* at 509, 498 A.2d at 1312. Having the authority to voluntarily do it under the Act, however, is not the same thing as saying that the Act requires it.

In *Township of Moon* the township had argued that because Act 111 expressly provides for interest arbitration, but makes no mention of a procedure for grievance arbitration, this absence of an express authorization represented a legislative intent not to provide for binding arbitration as a means of settling grievances. In support of that position the township referred, by analogy, to Act 195 or PERA,[21] which expressly provides for both interest and grievance arbitration procedures. The Supreme Court rejected the Township's argument and held that since, "unquestionably, the parties could have voluntarily agreed to a grievance procedure in accordance with the Uniform Arbitration Act, ... See, 42 Pa.C.S. § 7302(b) ... we can find no reason for holding that an arbitration panel should not have the same latitude in this area." *Township of Moon,* 508 Pa. at 510, 498 A.2d at 1312. Again, what is permitted under the authority of Act 111, does not at all mean that Act 111 requires it.

**Seventh,** the majority's statement that "because case law specifically holds that *the UAA is the source of the authorization* for the inclusion of grievance arbitration in police and fire collective bargaining, the standard of review that should be used ... is the one ... set forth in 42 Pa.C.S. § 7302(d) commonly known as the 'essence test' " (majority slip op. at p. 510; emphasis added), flies in the face of the Supreme Court's

21. The Public Employee Relations Act, or PERA, regulates the collective bargaining process for all public employees who are not police and fire officers.

decisions and pronouncements which are directly to the contrary. Thus, Justice Larsen wrote in *Appeal of Upper Providence Police:*

> The legislature was well aware of *City of Washington* and its progeny when it enacted not only the UAA, but also amendments to Act 111 in 1974, which amendments repealed Act 111 in part without modifying the standard of review set forth in *City of Washington* [narrow certiorari]. . . . Thus it is evidence that the legislature was satisfied with *this Court's determination* and the standard of review set forth in *City of Washington.* The legislature's awareness and tacit approval of the *City of Washington* standard of review is supported by the Official Source Note to section 7302 of the UAA which states that 'Subsection (d) is intended to preserve without change the scope of review which presently exists over awards of arbitrators such as those appointed under [Act 111].' (Emphasis added.)

*Id.,* 514 Pa. at 510, 526 A.2d at 319.

Likewise, Chief Justice Nix in *Township of Moon* specifically found that the source of authority for the settlement of grievance arbitration in Act 111 *was in Act 111 itself,* and thus wrote:

> Moreover, as previously noted in section 1 of Act 111 in setting forth the intended scope of that legislation also expressly stated that police and fire personnel 'shall have the right to' settlement of their grievances or disputes. The mere fact that the arbitration procedure is set forth in the context of an impasse does not warrant the inference that the concept of binding arbitration was to be limited to the resolution of contract negotiation difficulties. To do so would render meaningless section 1's assurance that the resolution of grievances and disputes comprised part of the subject matter to be addressed in the Act. Further, *section 1 unquestionably provides the right to an adjustment of grievances and disputes under the terms of an existing collective bargaining agreement. To conclude that the arbitration procedure was not intended to cover grievance and*

*dispute resolutions creates a right without providing a remedy for its enforcement.* (Emphasis added.)

*Id.,* 508 Pa. at 505, 498 A.2d at 1310.

To now hold, as the majority would have it, that the source for the settlement of Act 111 grievance disputes was a *1980* amendment to the UAA, after Act 111 had been in existence for approximately thirteen years, defiantly rejects, not follows, case law precedent.

**Eighth,** the application of the majority's holding would result in an unintended inconsistency because there are two distinct types of grievance arbitration, *viz.,* arbitration over the interpretation of a collective bargaining agreement and arbitration over a disciplinary matter. Both are considered grievance arbitration, however, and this Court has so held: *Barbaro* (interpretation grievance); *Allegheny County Police Ass'n* (interpretation grievance); *Wilson* (disciplinary grievance); *Young* (disciplinary grievance).

Heretofore, since all Act 111 arbitration awards were viewed through the same lens, there was consistency in our judicial review. Now that will be changed by the majority, because the original interest arbitration award will be reviewed under the narrow certiorari standard while the interpretation of that award, which is later in controversy and resolved by a grievance arbitration award, will be judged by a different standard, permitting the courts to become involved in the collective bargaining process at a later time to an extent and a degree proscribed to the judiciary at the inception.

### Review of the Arbitrator's Award

#### 1. Restrictive duty discipline

Having established a standard different than that which has been employed by the majority, I am obliged to now proceed to review Arbitrator Lang's Award wherein he articulated at the outset the precise issue which was placed before him:

ISSUE: Did the State Police have just cause to discipline the grievant for his asserted violation of Field Regulation

1.01 UNBECOMING CONDUCT; if not, what shall the remedy be??

After reviewing the testimony from the court-martial proceeding, the Arbitrator found as a fact that Trooper Betancourt did expose himself based upon the trooper's admission to his supervisor, Sergeant John Lyle, who was investigating the incident. Once having established that fact, the Arbitrator then proceeded to the "consideration of whether the grievant's behavior, under all the circumstances, constitutes a violation of F.R. 1–1, Section 1.01—Unbecoming Conduct, and the appropriateness of the penalty imposed." (Award, page 5).

Unbecoming Conduct is defined in the Field Regulations as follows:

1.01 UNBECOMING CONDUCT:

A member shall not conduct himself/herself in a manner which is unbecoming to a police officer. Unbecoming conduct is that type of conduct which could reasonably be expected to destroy public respect for State Police officers and/or confidence in the Pennsylvania State Police.

After determining that the "major thrust" of the regulation was the public's respect and confidence in the State Police, the Arbitrator then concluded, because there was no public exposure, and because Trooper Betancourt's fellow officers tacitly condoned his behavior, that "[a]ny reasonable person would be forced to conclude that the grievant's behavior does not squarely fit the conduct that F.R. 1.01 defines as 'Unbecoming.'" (Award, page 6). His Award then ordered that Trooper Betancourt be made whole by restoring all lost wages, including wages that would have been normally earned during the time of his restricted duty. He further ordered that the entire "Jolly Pecker episode" be stricken from Trooper Betancourt's personnel record.

Similar to the problem which confronted us in *Pennsylvania State Police*, the parties here differ over what precise issue, or issues, were placed before the Arbitrator to resolve. Of major significance is the Arbitrator's award of back pay, including overtime and night-shift differential, which would have been

normally paid to Trooper Betancourt except for the fact that he was assigned to restrictive duty. PSP argues that such discipline was not a penalty imposed as part of the court-martial proceeding but rather resulted from the action taken by the Troop Commander, pursuant to Field Regulation § 33.-06, which provides for either restricted duty or suspension of a trooper pending an investigation of charges for a violation of other regulations. The Association counters that the issue as recited in the award itself states in pertinent part: "Did the State Police have just cause to *discipline* the grievant. . . ." and that Trooper Betancourt's restrictive duty assignment was part of his discipline. The Association, however, overlooks the remaining language of the quoted statement of the issue. The complete statement of the issue, which was the *only* matter which went before the Commissioner for court-martial consideration, is: "Did the State Police have just cause to discipline the grievant *for his asserted violation of Field Regulation 1.101 Unbecoming Conduct;* if not, what shall the remedy be"? The discipline which resulted from *that* proceeding was only the 30–day suspension, not the restricted duty assignment, and there is no evidence in the record that the separate restrictive duty discipline was grieved or consolidated into the court-martial proceedings.

Moreover, following the election agreement between the Association and PSP, Trooper Betancourt signed and submitted a form entitled "Member's Election of Procedure to be Followed" which indicates his choice of the grievance procedure over the court-martial proceeding and pertinently states:

> I wish to grieve the *penalty imposed by the Commissioner* as a result of my court-martial. I expect to be scheduled for a grievance hearing before a neutral arbitrator in accordance with the [CBA] between the Commonwealth of Pennsylvania and the Fraternal Order of Police. (Emphasis added; R.R. 247(a).)

And, Article 28, Section 1 of the Collective Bargaining Agreement entitled "Grievance Procedure," provides that the Arbitrator "shall confine himself/herself to the precise issue sub-

mitted for arbitration and shall have no authority to determine any other issues not so submitted to him/her." (R.R. at 2a).

I must conclude, therefore, that Trooper Betancourt's restrictive duty discipline was beyond the scope of the precise issue submitted to Arbitrator Lang, and therefore his disposition with regard to it was in excess of his authority *Bojanowski; Wilson.*

## 2. Suspension

The 30–day disciplinary suspension meted out by the Commissioner in the court-martial proceeding, however, was clearly an issue before the arbitrator and his award reinstating Trooper Betancourt with back pay for that period of time was entirely proper.

We expounded at length on the underlying reasoning and analysis of the "just cause for discipline cases" in *Pennsylvania State Police* explaining that where, as here, the arbitrator finds as a fact that the grievant committed the acts which led to the imposition of discipline, but also concludes that there was no "just cause" for the discipline, the extent of judicial review over the arbitrator's award may be of critical importance. It is in this case.

Arbitrator Lang concluded that the "major thrust" of the definition of unbecoming conduct in the Field Regulations of PSP was the public's respect and confidence in the State Police, but since Trooper Betancourt's actions occurred out of "public" view and were condoned by his fellow officers, "any reasonable person would be forced to conclude that the grievant's behavior does not squarely fit the conduct that F.R. 1.01 defines as unbecoming."

Were the Arbitrator's conclusion a jury's verdict, we might be obliged to set it aside because "unbecoming conduct," while connoting the *public's* disrespect, is not conduct that must be in the public view. If it were, even heinous crimes of police officers committed in "secret" would not be grounds upon which they could be dismissed. Case law has made clear a contrary view:

In Pennsylvania, our courts' continuous construction of the phrase 'conduct unbecoming an officer' has resulted in refining the offense to a clearly discernible standard. In *Zeber Appeal,* 398 Pa. 35, 156 A.2d 821 (1959), we enunciated that

> Unbecoming conduct on the part of a municipal employee, especially a policeman or fireman, is any conduct which adversely affects the morale or efficiency of the bureau to which he is assigned. It is indispensable to good government that a certain amount of discipline be maintained in the public service. Unbecoming conduct is also any conduct which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services.

*Fabio v. Civil Service Commission of Philadelphia,* 489 Pa. 309, 316–17, 414 A.2d 82, 86 (1980).

In *Fabio,* a police officer induced his wife to consent to an extramarital affair with a fellow officer and he himself engaged in an extramarital affair with his wife's eighteen-year-old sister. The Supreme Court, even while recognizing that in Pennsylvania individuals have the right to engage in extramarital sexual activities and that an individual has a constitutional right to privacy, held nevertheless that the right to privacy is not an unqualified right when the government has a compelling state interest, *viz.,* regulating the activities of its employees, and upheld the officers' dismissal from the Philadelphia Police Force on grounds of "conduct unbecoming an officer."

In *Borough of Darby v. Coleman,* 47 Pa.Commonwealth Ct. 9, 407 A.2d 468 (1979), a police officer was dismissed for an adulterous affair but contended that his conduct was "private" as opposed to "public" and therefore his conduct did not rise to the level of "unbecoming conduct." Judge Theodore O. Rogers, writing for this Court and quoting an earlier similar decision in *Faust v. Police Civil Service Commission of Borough of State College,* 22 Pa.Commonwealth Ct. 123, 347 A.2d 765 (1975), wrote that "we do not believe that a distinction between 'private' and 'public' immorality or conduct has any bearing on the decision here.... To be immoral or unbecom-

ing a police officer['s] conduct must only 'be such as to offend publicly accepted standards of decency'.... *Borough of Darby*, 47 Pa.Commonwealth Ct. at 12, 407 A.2d at 471. Moreover, evidence that such conduct affects the morale of the police department or reduces its effectiveness is not essential to a finding of conduct unbecoming an officer." [22]

Having determined, however, that our review of Arbitrator Lang's decision is greatly restricted under Act 111, the Court would be compelled to uphold it because his conclusion that Trooper Betancourt's conduct was not unbecoming under PSP Field Regulation 1.01 was, at most, an error of law; his decision, legally in error though it may be, was within his authority to make. *Pennsylvania State Police; Wilson.*

### 3. Striking the "Jolly Pecker" episode from Trooper Betancourt's personnel record

Because Arbitrator Lang's award ordered PSP to strike the entire "Jolly Pecker" episode from Trooper Betancourt's personnel record, I would hold that the award must be corrected. That is to say, any record of the 30–day suspension should be removed from the Trooper's personnel file and any underlying charges upon which that suspension was based, should be prohibited from being considered in Trooper Betancourt's future evaluation for promotion, demotion, etc. Since, however, the restrictive duty discipline would be left intact, with its attendant loss of income and other benefits, the reasons for that discipline must remain in the Trooper's personnel record. That disciplinary action, and whatever reports, etc., that would ordinarily be in Trooper Betancourt's personnel file to substantiate that action, should remain, and, of course, could be considered in the Trooper's future advancement with PSP. Albeit the same reports, etc., underlie both disciplinary ac-

22. I note that in *Borough of Darby* our scope of review over the Civil Service Commission was limited to a determination of whether the Commission abused its discretion or committed an error of law. In upholding its decision we determined that no error of law was committed. *See Wilson,* for an explanation of review over police disciplinary matters appealed to a civil service commission.

tions, they may be considered only as they relate to the restrictive duty.

What this would mean essentially, is that while the reports and investigation results of the "Jolly Pecker" episode would remain in the personnel file of Trooper Betancourt, only the lesser discipline of the restrictive duty would be recorded as the final result of the "episode."

FRIEDMAN, J., joins in this dissent.